IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARTIN W. NOTHSTEIN,     :
              :
       Plaintiff,  :    CIVIL ACTION NO. 19-1631
              :
  v.           :
              :
USA CYCLING,       :
              :
       Defendant. :

**MEMORANDUM OPINION**

Smith, J.                   October 19, 2020

The plaintiff, a former star track cycling athlete for the United States, claims that the defendant published false information about him and leaked confidential and misleading information about him to the media. In discovery, the plaintiff sought the identity of the sources of confidential informants who provided allegedly false reports about the plaintiff's sexual misconduct to the defendant. After the defendant refused to provide the names of the sources and the parties were unable to resolve the issue, the plaintiff filed a motion to compel the production of certain unredacted documents which identify the alleged confidential informants.

In addition to the issue concerning the identity of the reporters of the alleged sexual misconduct, the defendant had apparently inadvertently disclosed the first name of one the reporters during discovery and clawed back that reference. The plaintiff referenced the name of this inadvertently disclosed reporter in the aforementioned motion to compel and in his brief in opposition to a motion for summary judgment filed by the defendant. The defendant then moved to have the court strike the plaintiff's submissions with references to the reporter.

This court referred both motions (along with all discovery issues in the case) to the United States Magistrate Judge, who entered an order which, *inter alia* (1) denied the plaintiff's motion

to compel the defendant to produce the identity of the reporters, (2) determined that the defendant had properly clawed back the reference to the inadvertently disclosed reporter, and (3) directed the plaintiff to refile his submissions without reference to this reporter and to not use the name of this reporter in any future filings.

The plaintiff now brings this discovery dispute before the undersigned after timely objecting to the United States Magistrate Judge's order resolving the discovery disputes concerning the names of the reporters of alleged sexual misconduct. After reviewing the parties' submissions, the court overrules the objection relating to the motion to compel and sustains the objection pertaining to the claw back issue.

## I.    PROCEDURAL HISTORY

The plaintiff, Martin W. Nothstein, filed the original complaint against the defendant, USA Cycling, Inc. ("USAC"), on March 28, 2019, in the Lehigh County Court of Common Pleas. Notice of Removal, Ex. B, Compl. at ECF p. 14, Doc. No. 1. The plaintiff alleges that USAC "defamed [him] and violated his confidentiality and privacy rights during the pendency of the SafeSport investigation by leaking information about the report and investigation to the media and falsely reporting on its website that [he] had been suspended for 'disciplinary' reasons." Compl. at ¶ 20. The complaint contains three counts: (1) defamation, (2) invasion of privacy – false light, and (3) invasion of privacy – intrusion upon seclusion. *Id.* at 7–13. On April 15, 2019, USAC removed the case to this court pursuant to 28 U.S.C. §§ 1332 and 1446. Notice of Removal at ¶¶ 6, 16.

At the onset of discovery, on September 16, 2019, the parties entered into a stipulated protective order providing that either party could designate certain discovery materials as "confidential" and file those materials under seal during the discovery period. Doc. No. 17. This court entered this first stipulated protective order on September 17, 2019. Doc. No. 18. The parties

also entered into a confidentiality stipulation on January 3, 2020, and the court entered this stipulation as an order of court on January 6, 2020. Doc. Nos. 29, 31. On January 27, 2020, after granting multiple extensions for the parties to complete discovery, the court ordered the parties to complete all fact discovery by February 28, 2020. Doc. No. 38. On February 14, 2020, the court referred the case to United States Magistrate Judge Marilyn Heffley to serve as discovery master to assist the parties in settling any ongoing and future discovery disputes. Doc. No. 42.

As pertinent to the instant discovery dispute, on November 19, 2019, USAC served the plaintiff with its document production. Def.'s Mem. of L. in Opp'n to Pl.'s Objs. to Judge Heffley's June 5, 2020 Order ("Def.'s Mem. in Opp'n to Objs.") at 2, Doc. No. 91. Some of these documents contained redactions of the names of alleged victims and reporters of the plaintiff's alleged sexual abuse. *Id.* On January 16, 2020, counsel for the plaintiff deposed USAC's former risk protection manager, Jonathan Whiteman. Pl.'s Mem. of L. in Supp. of His Obj. to the June 5, 2020 Order Under Fed. R. Civ. P. 72(a) ("Pl.'s Objs.") at 3, Doc. No. 85-2. During this deposition, USAC realized it had inadvertently produced documents revealing the first name of one of the reporters of the plaintiff's alleged sexual abuse. Def.'s Mem. in Opp'n to Objs. at 2. USAC's counsel then clawed back the document revealing the first name of the alleged reporter. *Id.*

On January 30, 2020, the plaintiff wrote a letter to the court objecting to the redactions of five documents containing the names of alleged victims and reporters of his alleged sexual abuse. Def.'s Mem. of L. in Opp'n to Pl.'s Mot. to Compel ("Def.'s Opp'n to Mot. to Compel"), Ex. A, Doc. No. 75–1. USAC produced a privilege log on February 26, 2020, explaining its reasoning for the redactions. Ltr., Ex. 1, Doc. No. 45–1. Subsequently, on March 30, 2020, Judge Heffley held a discovery hearing regarding the dispute over the five redacted documents. Doc. No. 49. The next day, March 31, 2020, Judge Heffley entered an order which, *inter alia*, declared the five documents

properly redacted and instructing the plaintiff's counsel to inform USAC's counsel of any additional documents that he determined should be unredacted to reveal the names of alleged victims or reporters of sexual abuse. *See* Mar. 31 Order at 1, Doc. No. 50. The plaintiff subsequently identified nine additional documents he argued should be unredacted to reveal the names of alleged victims or reporters of sexual abuse. Def.'s Mem. in Opp'n to Objs. at 3. The parties could not resolve their disputes, so Judge Heffley ordered the plaintiff to file a motion to compel production of the unredacted documents. *Id.*; Pl.'s Mem. of L. in Supp. of His Mot. to Compel the Production of Unredacted Documents ("Pl.'s Mot. to Compel") at 3, Doc. No. 63-1.

On April 13, 2020, USAC filed a motion for summary judgment. Doc. No. 51. The Center for SafeSport sought permission from this court to file an amicus brief on April 17, 2020.[1] Doc. No. 55. The court granted the motion on April 20, 2020, and directed the clerk of court to docket the Center for SafeSport's amicus brief as a separate document. Doc. No. 56. On the same date, the clerk of court docketed the amicus brief. Doc. No. 57. The plaintiff filed a response in opposition to the motion for summary judgment on May 11, 2020. Doc. No. 61. USAC filed its reply brief on May 18, 2020. Doc. No. 67.

The plaintiff filed a motion to compel the unredacted documents on May 13, 2020, in compliance with Judge Heffley's March 31, 2020 order. Doc. No. 63. The plaintiff contemporaneously filed a motion for leave to file under seal portions of his brief in support of his response in opposition to USAC's motion for summary judgment, certain exhibits attached thereto, and his counter-statement of material facts pursuant to the stipulated protective order. Doc. No. 62. The plaintiff also filed a motion for leave to file under seal portions of his brief in support of

---

[1] "The United States Center for SafeSport is the 'independent national safe sport organization for the United States.'" Mot. for Leave to File Amicus Br. of the U.S. Ctr. for SafeSport at 1, Doc. No. 55. "As part of its statutory mandate, the Center receives and investigates reports of sexual, physical, and emotional abuse within Olympic and Paralympic sports." *Id.*

his motion to compel pursuant to the stipulated protective order. Doc. No. 64. In response, USAC

filed a motion to (1) strike the plaintiff's brief in opposition to USAC's motion for summary

judgment, the plaintiff's response to USAC's statement of facts and the plaintiff's counter-

statement of facts, and the plaintiff's motion to seal; (2) enforce the parties' protective order; and

(3) impose sanctions on the plaintiff for referencing the name of an alleged reporter that had been

inadvertently disclosed and clawed back by USAC. Doc. No. 66. On May 19, 2020, the court

referred these motions to Judge Heffley for disposition. Doc. No. 69.

USAC filed its brief in opposition to the plaintiff's motion to compel and a motion for

leave to file under seal portions of its opposition to plaintiff's motion to compel on May 26, 2020.

Doc. No. 75. On May 28, 2020, the plaintiff filed a response in opposition to USAC's motion to

strike, motion to enforce the parties' protective order, and motion for sanctions. Doc. No. 77. The

court referred USAC's motion to seal to Judge Heffley for final disposition on June 1, 2020. Doc.

No. 79. On June 4, 2020, USAC filed its reply brief in support of its motion to strike, motion to

enforce the parties' protective orders, and motion for sanctions. Doc. No. 81.

On June 5, 2020, Judge Heffley issued an order (1) denying the plaintiff's motion to

compel, (2) granting in part the plaintiff's motion for leave to file under seal portions of his brief

in support of his response in opposition to USAC's motion for summary judgment, certain exhibits

attached thereto, and his counter statement of material facts, and the plaintiff's motion for leave to

file under seal his motion to compel and certain exhibits attached thereto, (3) granting in part and

denying in part USAC's motion to strike the plaintiff's opposition papers, to enforce the parties'

protective orders, and for sanctions, and (4) granting USAC's motion to file under seal portions of

its response to plaintiff's counter-statement of material facts and exhibit A thereto and USAC's

motion to file under seal portions of its opposition to plaintiff's motion to compel. June 5, 2020

Order, Doc. No. 82.

On June 19, 2020, the plaintiff filed objections to Judge Heffley's June 5, 2020 order as

well as a brief in support of his objections. Doc. No. 85. On the same date, the court scheduled

oral argument on the objections for the same time as the previously scheduled oral argument on

the motion for summary judgment, which was set for June 22, 2020. Doc. No. 86. However, during

the June 22, 2020 oral argument, the court did not address the objections, and, instead, granted

USAC time to respond to the objections.

On June 25, 2020, the plaintiff filed a motion to stay paragraphs two and three of Judge

Heffley's order. Doc. No. 89. On June 29, 2020, the court entered an order granting the plaintiff's

motion to stay portions of Judge Heffley's June 5, 2020, order. Doc. No. 90.

USAC filed its response in opposition to the plaintiff's objections to Judge Heffley's order

on July 6, 2020. Doc. No. 91. The plaintiff filed his reply brief in support of his objections on July

31, 2020. Doc. No. 95.[2] The court held oral argument on the plaintiff's objections to Judge

Heffley's order on August 4, 2020. The objections are now ripe for disposition.

## II.    FACTUAL BACKGROUND

The plaintiff is an Olympic gold medalist cyclist and a politician. Mot. to Compel at 1;

Def.'s Opp'n to Mot. to Compel at 2. He alleges that, in October 2018, shortly after he announced

a bid for the United States House of Representatives, "an 'anonymous tipster' contacted [USAC]

and apparently accused [the plaintiff] of engaging in sexual misconduct[.]" Compl. at ¶ 11. The

---

[2] During oral argument, USAC objected to the court considering the plaintiff's reply brief because the plaintiff filed the brief almost four weeks after USAC filed its response to the plaintiff's objections and without seeking the court's permission in compliance with this court's posted policies. While the court appreciates USAC's compliance with and notice of this court's policies, the court will exercise its discretion and consider the sur-reply to resolve this matter fully on the merits rather than on a technicality. *See Petrunich v. Sun Bldg. Sys., Inc.*, No. 3:CV-04-2234, 2006 WL 2788208, at *3 (M.D. Pa. Sept. 26, 2006) ("[A] disposition on the merits is preferred over a decision based upon procedural technicalities.").

plaintiff claims USAC subsequently published false statements about him by putting his name on

a list of suspended riders and communicating to *The Morning Call* that (1) it received a complaint

concerning the plaintiff; (2) it forwarded the complaint to SafeSport; (3) before referring the

complaint, it "gathered 'enough specificity to allege a policy has been violated;'" (4) the

"'allegation . . . included sexual misconduct;'" and (5) "[w]hen [it] receives an allegation of sexual

misconduct, [it is] not making any determination of validity before reporting it to the U.S. Center

for SafeSport." *Id.* at ¶¶ 28–30, 38; Def. USA Cycling, Inc.'s Mot. for Summ. J., Ex. L, Doc. No.

51-14. Based on these claims, the plaintiff seeks to hold USAC liable for defamation and invasion

of privacy. Compl. at 7, 10–11.

This discovery dispute arises out of the pending litigation. As indicated above, Judge

Heffley issued an order with four decisions resolving the parties' discovery disputes on June 5,

2020. The plaintiff objects to two of those decisions: (1) Judge Heffley's decision to deny his

motion to compel USAC to turn over unredacted copies of documents and (2) Judge Heffley's

decision that USAC's claw back of the first name of one of the alleged reporters was proper.[3] The

---

[3] Judge Heffley did not file a separate opinion setting forth her reasoning for her decisions. The two relevant portions of the June 5, 2020 decision in their entirety are as follows:

> Plaintiff's Motion to Compel the Production of Unredacted Documents (Doc. No. 63) is **DENIED**. The undersigned finds that the highly sensitive nature of this information, the interest in protecting the anonymity of individuals who reported the alleged sexual abuse on the part of Plaintiff, as well as the victims of Plaintiff's alleged conduct, far outweighs the marginal relevance that the identity of these individuals may have on Plaintiff's ability to prove his claims against USA Cycling, including any alleged malice on the part of USA Cycling. Accordingly, redactions necessary to protect the identity of these individuals is proper.

> . . .

> USA Cycling's Motion to Strike Plaintiff's Opposition Papers, to Enforce the Parties' Protective Orders, and for Sanctions (Doc. No. 66) is **GRANTED IN PART** and **DENIED IN PART**. The undersigned finds that USA Cycling's claw back of the identity of a reporter of alleged sexual abuse that was inadvertently disclosed during discovery was proper. To the extent any of Plaintiff's filings reference the properly clawed-back identity of the reporter, Plaintiff is ordered to refile them without any reference to the inadvertently disclosed information and to refrain from using or disclosing the foregoing information in any future filings. Pursuant to Judge Smith's May 19, 2020 Order referring USA Cycling's request for sanctions to the undersigned for a certification of facts (Doc. No. 69),

plaintiff seeks to obtain the names of the alleged reporters on the grounds that the names are

relevant to his defamation and false light claims, which require proof of actual malice.[4] Pl.'s Mot.

to Compel at 2, 6.

### III.   DISCUSSION

### A.   <u>Standard of Review</u>

The plaintiff must clear a high hurdle to compel this court to overturn a magistrate judge's

decision of a non-dispositive pretrial matter. When a district judge "designate[s] a magistrate judge

to hear and determine any [non-dispositive] pretrial matter pending before the court," the district

judge "may reconsider" the magistrate's determination "where it has been shown that the

magistrate judge's order is *clearly erroneous* or *contrary to law*." 28 U.S.C. § 636(b)(1)(A)

(emphasis added); *see also* Fed. R. Civ. P. 72(a) ("The district judge" who referring non-

dispositive matters to magistrate judge "must consider timely objections and modify or set aside

any part of the order that is clearly erroneous or contrary to law."). "The clearly erroneous standard

applies to a magistrate's findings of fact, and the contrary to law standard applies to the

magistrate's conclusions of law." *United States v. Hofstetter*, 423 F. Supp. 3d 502, 505 (E.D. Tenn.

2019); *see also Cipollone v. Liggett Grp., Inc.*, 822 F.2d 335, 348 (3d Cir. 1987) (Garth, J.,

dissenting) (explaining that district court "should have reviewed the magistrate's opinion and order

using the 'clearly erroneous and contrary to law' standard prescribed by 28 U.S.C. §

---

and having considered the parties' briefing, the undersigned does not consider Plaintiff's conduct to
constitute civil contempt and consequently declines to certify facts warranting holding Plaintiff in
civil contempt. However, in light of the undersigned's determination that redactions made to protect
the identity of alleged victims and individuals who reported alleged sexual abuse on the part of
Plaintiff are proper, any disclosure of that information in future filings may warrant certifying facts
to Judge Smith pursuant to 28 U.S.C. § 636(e)(6)(B) to support a finding of civil contempt.

June 5, 2020 Order at 2–3.
[4] These documents are Bates stamped USAC02995–3002, 3062–3065, 3433, 3612–3614, 3616–3619, 3625–3648,
and 3650–3653.

636(b)(1)(A)," meaning that district court "would determine whether the facts found by the magistrate to support the good cause determination were clearly erroneous and whether the conclusions of law supporting the finding were contrary to law. If the district court held that the facts found by the magistrate were clearly erroneous or that conclusions of law were incorrect, then the district court must reconsider the magistrate's decision"). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). A decision is contrary to law if it "contradict[s] or ignore[s] applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Hofstetter*, 423 F. Supp. 3d at 505 (alterations in original) (quoting *United States v. Assad*, No. 2:18-CR-140, 2019 WL 5396783, at *3 (E.D. Tenn. Oct. 22, 2019)); *see also Alarmax Distribs., Inc. v. Honeywell Int'l Inc.*, Civ. A. No. 2:14-cv-1527, 2015 WL 12756857, at *1 (W.D. Pa. Nov. 24, 2015) ("A finding is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." (citation omitted)). The appealing party bears the burden of demonstrating that the magistrate's finding of fact is clearly erroneous or that her conclusion of law is contrary to law. *See Alarmax Distribs.*, 2015 WL 12756857, at *1 ("The burden of demonstrating clear error rests with the appealing party.").

### B.     Analysis

### 1.     The Plaintiff's First Objection: Obtaining the Reporters' Names

In its response to the plaintiff's motion to compel the production of the unredacted documents, USAC requests a protective order to prevent the plaintiff from obtaining the names and identities of the reporters. Def.'s Opp'n to Mot. to Compel at 7 (arguing that "the presumption that all relevant material is discoverable is defeasible under Rule 26(c)(1), as the court has the

discretion to issue protective orders" (internal quotation marks omitted)). Judge Heffley denied the

plaintiff's motion to compel the production of the unredacted documents on the grounds that

> the highly sensitive nature of this information, the interest in protecting the anonymity of individuals who reported the alleged sexual abuse on the part of Plaintiff, as well as the victims of Plaintiff's alleged conduct, far outweighs the marginal relevance that the identity of these individuals may have on Plaintiff's ability to prove his claims against USA Cycling, including any alleged malice on the part of USA Cycling.

Order at 2, Doc. No. 82.

The plaintiff argues that the decision to deny the motion to compel the production of the

unredacted documents is contrary to law because the names of the alleged victims and reporters

are nonprivileged and, thus, discoverable. Pl.'s Objs. at 4–9. USAC argues in response that two

privileges apply to this information: the investigatory privilege and the SafeSport Authorization

Act ("SSAA"), 36 U.S.C. §§ 220541–43. Def.'s Mot. in Opp'n to Mot. to Compel at 8–11, 16.

The discovery rules permit "two approaches to seeking the protection of sensitive—but

relevant[5]—information, like that at issue here." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000)

(footnote added). The first approach is to argue "that the information is protected by an evidentiary

privilege. Any material covered by a properly asserted privilege would necessarily be protected

from discovery, pursuant to Rule 26(b)(1)." *Id.* If a privilege does not apply to the information, "a

party may petition the court for a protective order that limits discovery in accordance with Rule

26(c)." *Id.* Rule 26(c) endows the court with the power "to fashion a set of limitations that allows

as much relevant material to be discovered as possible, while preventing unnecessary intrusions

---

[5] Both parties agree that the identities of the reporters and alleged victims clear the "low bar" necessary to establish relevance. *Philadelphia Workforce Dev. Corp. v. KRA Corp.*, 673 F. App'x 183, 190 (3d Cir. 2016) (citing Federal Rule of Evidence 401); Def.'s Mem. in Opp'n to Mot. to Compel at 2 ("USAC did not redact this information on relevancy grounds."); Pl.'s Objs. at 2 ("The Order of June 5, 2020, however, bars access to unredacted versions of documents that show the identity of these informants, which is critically relevant to Nothstein's case.").

into the legitimate interests . . . that might be harmed by the release of the material sought." *Id.* These legitimate interests include "privacy and other confidentiality interests[.]" *Id.*

In analyzing whether Judge Heffley's decision to deny the motion to compel the unredacted documents was contrary to law the court the court must first analyze whether the redacted identities of the alleged reporters and victims are privileged. If they are not privileged, then the court considers whether a protective order is appropriate, given that "[w]here . . . a privilege is not available," a court may issue a protective order in accordance with Rule 26(c). *Id.* As discussed below, although the court concludes the identities are not privileged, a protective order is appropriate in this instance. Therefore, Judge Heffley's decision that USAC need not produce the unredacted documents was not contrary to law.

a.    <u>The Reporters' Names Are Not Privileged</u>

USAC contends there are two privileges that apply to the identities of the reporters and alleged victims: the investigatory privilege and the SSAA. However, the investigatory privilege does not apply in this context and the SSAA does not establish a privilege.[6]

i.    *The Investigatory Privilege Does Not Apply to USAC*

The analysis of whether the investigatory privilege applies to USAC proceeds in four parts. First, the court examines whether the investigatory privilege in the form USAC asserts it is a valid privilege. Second, the court reviews whether the investigatory privilege requires compliance with certain procedural hurdles. Third, the court determines whether USAC complied with those procedures. Fourth, the court investigates whether other courts typically extend the investigatory

---

[6] USAC argues that the "sole basis for Plaintiff's Objections is Judge Heffley's alleged failure to consider" a balancing test necessary to establish the applicability of the investigatory privilege. Def.'s Mem. in Opp'n to Objs. at 7. It asserts that the plaintiff "never once raised" this test "in his Motion to Compel," and, therefore, the court must dismiss the plaintiff's objections. *Id.* The court rejects this argument because the plaintiff clearly argued that the documents were not privileged. The plaintiff's failure to specifically enunciate this test does not amount to a waiver of the argument.

11

privilege to non-governmental bodies like USAC. Ultimately, the court concludes that the investigatory privilege does not apply because USAC did not comply with the requisite procedures necessary to establish the investigatory privilege and because this privilege does not extend to non-governmental bodies that do not perform investigations.

(a)     Is the Investigatory Privilege a Valid Privilege?

The parties seem to agree that the ten-factor[7] test set forth in *Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D. Pa. 1973) governs whether USAC's asserted privilege applies in this case. Pl.'s Objs. at 6–7; Def.'s Mem. in Opp'n to Objs. at 13.[8] However, when the Third Circuit acknowledged this test, it chose not to adopt it. For this reason, the court examines whether the privilege is valid such that the court can apply it.

*Frankenhauser* involved a civil rights action in which the plaintiffs sued police officers who shot and killed their father. 59 F.R.D. at 339–40. The plaintiffs sought copies of witness statements and police reports concerning the shooting. *Id.* at 340. The defendants refused to divulge these documents, asserting "an executive privilege." *Id.* The court referred to "[e]xecutive

---

[7] The ten factors for consideration include:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

*Frankenhauser*, 59 F.R.D. at 344.

[8] The court recognizes that the plaintiff asserts that a law enforcement investigative privilege does not apply in this case insofar as USAC "has not laid the necessary predicate to claim any law enforcement investigation privilege" as required by the Third Circuit Court of Appeals in *United States v. O'Neill*, 619 F.2d 222 (1980). *See* Pl.'s Objs. at 7. The plaintiff also argued that "neither [USAC] nor [Judge Heffley's June 5, 2020 order] follows the *Frankenhauser/Carusone*[ *v. Kane*, No. 1:16-CV-1944, 2017 WL 5900429 (M.D. Pa. Nov. 30, 2017)] ten-factor balancing test[.]" *Id.*

privilege" as "the government's privilege to prevent disclosure of certain information whose disclosure would be contrary to the public interest." *Id.* at 342. Upon examination of a wide array of cases and proposed Federal Rule of Evidence 509 (which Congress ultimately rejected),[9] the court delineated the ten-factor balancing test. *Id.* at 342–44. The ten factors aim to "balance the public interest in the confidentiality of governmental information against the needs of a litigant to obtain data, not otherwise available to him, with which to pursue a non-frivolous cause of action." *Id.* at 344. After applying this test, the court granted the plaintiffs access to the signed statements of witnesses and police reports containing factual data, but did not "require disclosure of the evaluative summary portion of the police investigative reports[.]" *Id.* at 345.

The Third Circuit briefly discussed the *Frankenhauser* privilege in *United States v. O'Neill*, 619 F.2d 222 (3d Cir. 1980). In *O'Neill*, the government appealed a district court's denial of its motion to enforce subpoenas against police department officials. 619 F.2d at 224. The subpoenas sought information pertaining to training, investigation, and discipline in the police department. *Id.* Officials refused to produce material pertaining to "any actions which resulted in allegations of excessive, inappropriate, deadly or illegal use of force by [specified] current or former police officers[.]" *Id.* at 225. "The district court denied the enforcement of the subpoenas on the basis of executive or 'governmental' privilege." *Id.* at 224. The Third Circuit vacated the lower court decision and remanded the case to the district court for two reasons: (1) the defendants did not invoke the privilege because they failed to abide by requisite procedures; and (2) the defendants did not have a broad privilege to refuse to disclose "material relating to ongoing civil and criminal investigations" given that there is "no Supreme Court case which provides support for such a" privilege. *Id.* at 225–27, 229.

---

[9] For the text and an in-depth discussion of "[t]he tangled history of Rejected Rule 509," see 26A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5661 (Apr. 2020 Update).

*O'Neill* cites *Frankenhauser* twice. First, *O'Neill* discusses *Frankenhauser* in relation to whether the head of the government organization properly invoked executive privilege. *See* 519 F.2d at 226 (contrasting *Frankenhauser* with two other cases to demonstrate "[i]t has been suggested that it is inappropriate for the [executive] privilege to be invoked by attorneys instead of by the department head"). Second, the court references *Frankenhauser* as a "lower court opinion[] which appears to accept the general confidentiality of investigatory files[.]" *Id.* at 230. The Third Circuit read *Frankenhauser* as a case which "articulat[ed] the existence of a privilege of the Government to withhold documents in the 'public interest,'" but that ultimately "found that such interest did not justify the resistance to disclosure," and is, therefore, "questionable precedent on which to base the existence of such a privilege." *Id.* The *O'Neill* court determined that such a capacious privilege is inappropriate because the court "know[s] of no Supreme Court case which provides such a broad amorphous Government privilege[,]" and the court would not "deem it appropriate to extend the scope of Executive Privilege in this case beyond the lines drawn to date by the Supreme Court." *Id.*

Since the Third Circuit penned *O'Neill*, *Frankenhauser* has become "the seminal case identifying the factors to evaluate and balance when deciding whether the law enforcement privilege applies." *Groark v. Timek*, 989 F. Supp. 2d 378, 390 (D.N.J. 2013); *see also In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570 (5th Cir. 2006) (using "[t]he oft-cited *Frankenhauser* test"). In applying the *Frankenhauser* test, courts have not applied the "broad amorphous Government privilege," of which the Third Circuit warned. Rather, courts have applied a qualified privilege with firm boundaries. For this reason, although "the Third Circuit has not adopted this test," and, in fact, declined to discuss *Frankenhauser*'s validity in *O'Neill*, this court "believes that the Third Circuit would adopt [the *Frankenhauser*] balancing test if presented with the question."

14

*Beckwith v. Blair Cnty.*, Case No. 3:18-cv-40, 2019 WL 343248, at *4 (W.D. Pa. Jan. 28, 2019) (internal quotation marks omitted) (quoting *Smith v. Rogers*, Case No. 3:15-cv-264, 2017 WL 2397957, at *7 (W.D. Pa. July 10, 2017)); *see Parno v. Kane*, Civil No. 1:16-cv-1949, 2017 WL 5900477, at *3 n.2 (M.D. Pa. Nov. 30, 2017) (reiterating conclusion on this point from *Smith*); *Carusone*, 2017 WL 5900429, at *3 n.2 (same). Because the court predicts the Third Circuit would, in fact, adopt the *Frankenhauser* privilege, the court concludes that this privilege is valid privilege for USAC to assert in the instant case.

(b)     Must the Party Asserting the *Frankenhauser* Investigatory Privilege Abide by the *O'Neill* Procedural Requirements?

The plaintiff argues that before the court can assess whether the investigatory privilege applies to the redacted identities, the court must consider whether USAC has "laid the necessary predicate to claim any law enforcement investigation privilege." Pl.'s Objs. at 7. The plaintiff cites *O'Neill* to support this content. *Id.*

In *O'Neill*, the Third Circuit established that "to support a claim of executive privilege at least three requirements must be satisfied." 619 F.2d at 226. These requirements include: (1) the head of the agency invoking the privilege "must personally review the material," (2) the head must provide "a specific designation and description of the documents claimed to be privileged," and (3) the head must provide "precise and certain reasons for preserving" the confidentiality of the documents. *Id.* (internal quotation marks omitted). Typically, the claim "must be raised by [the agency head's] affidavit." *Id.* However, *O'Neill* did not purport to address an "investigatory privilege." Rather, *O'Neill* addressed the "executive privilege." *Id.*

The court must determine whether the investigatory privilege is a type of executive privilege that mandates a party meet the *O'Neill* procedural requirements before invoking it.[10] This is not a question that courts in this circuit have answered in a uniform fashion. *Compare Groark*, 989 F. Supp. 2d at 390 (D.N.J. 2013) (applying *O'Neill* requirements to *Frankenhauser* investigatory privilege), *and Torres v. Kuzniasz*, 936 F. Supp. 1201, 1210 (D.N.J. 1996) ("A claim of executive or law enforcement privilege must be asserted by the head of the agency claiming the privilege after he or she has personally reviewed the material and submitted 'precise and certain reasons for preserving' the confidentiality of the communications." (quoting *O'Neill*, 619 F.2d at 226)), *with Smith*, 2017 WL 2937957, at *4–8 (applying *O'Neill* procedural requirements to assertion of deliberative process privilege analysis, but not to law enforcement investigatory privilege analysis), *and Carusone*, 2017 WL 5900429, at *2–3 (applying "the executive or governmental privilege" which it also called "the law enforcement investigatory privilege" but never referencing *O'Neill*).

This court concludes that the *Frankenhauser* investigatory privilege requires satisfying the procedural requirements set out in *O'Neill*, because the procedures *O'Neill* lays out apply to parties' assertions of all executive privileges.[11] *See, e.g.*, *El Badrawi v. Dep't of Homeland Sec.*,

---

[10] This court is not the first to face this lexiconic struggle. *See Kelly v. City of San Jose*, 114 F.R.D. 653, 660 (N.D. Cal. 1987) (noting "[o]ne small step toward conceptual cleanliness in this area consists of choosing a name for the privilege" some of which included "the governmental privilege and the official information privilege" (internal quotation marks omitted)); 26A Wright & Miller, *Federal Practice and Procedure* § 5673 (Apr. 2020 Update) ("It has been suggested that the executive privilege is 'complex.' Surely one reason for this is a problem of nomenclature[.]" (internal footnotes omitted)). The *Kelly* court opted to call the privilege the "official information privilege" so as to avoid confusion with "implications that might cause it to be equated with the 'deliberative process' privilege, which is at once too narrow and too generous to the government for the kinds of cases in issue here." 114 F.R.D. at 660.

[11] The *Frankenhauser* court did not abide by this requirement. *See* 59 F.R.D. at 342 n.6 (deciding not to follow *Carter v. Carlson*, 56 F.R.D. 9 (D.D.C. 1972) wherein the court "ordered discovery because, *inter alia*, the privilege was invoked by counsel for the police rather than by the police chief or mayor"). However, the court does not apply this portion of *Frankenhauser* for two reasons. First, the decision came before *O'Neill* announced that procedural requirements apply to all assertions of executive privileges. Second, the *Frankenhauser* court justified its decision to forego this requirement by relying on "the procedure rule prescribed by rule [sic] 509(c), Federal Rules of Evidence, which allow[ed] counsel for the government to assert the" executive privilege and "require[d] that executive officials

258 F.R.D. 198, 204 (D. Conn. 2009) (holding government met requirement to assert "law enforcement privilege" after submitting two declarations from "Executive Assistant Director of FBI's National Security Branch, asserting a formal claim of privilege"). *O'Neill* used *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953) as the source for the procedural requirements it imposed. 619 F.2d at 226. *Reynolds* did not deal with the privilege the Third Circuit faced in *O'Neill*. Rather, *Reynolds* dealt "with the claim of privilege for state and military secrets[.]" *Id.* Nonetheless, the *O'Neill* court reasoned that *Reynolds*'s "prerequisites for formal invocation of the privilege have been uniformly applied irrespective of the particular kind of executive claim advanced." *Id.* (citation and internal quotation marks omitted). In applying *Reynolds*'s requirements to a different type of executive privilege, the Third Circuit "championed" the notion "that Reynolds applies to all types of executive privilege[.]" Shilpa Narayan, Note, *Proper Assertion of the Deliberative Process Privilege: The Agency Head Requirement*, 77 FORDHAM L. REV. 1183, 1202.

Since the *Frankenhauser* privilege is a type of executive privilege, the *O'Neill* procedural requirements apply to it. Having rendered this conclusion, the court examines whether USAC met the *O'Neill* procedural requirements prior to asserting the *Frankenhauser* privilege to withhold the identity of the reporters and alleged victims in this case.

(c)     USAC Has Not Met the Procedural Requirements Necessary to Establish the Privilege

As previously discussed above, under *O'Neill*, before asserting an executive privilege, (1) the head of the agency invoking the privilege "must personally review the material," (2) the head must provide "a specific designation and description of the documents claimed to be privileged," and (3) the head must provide "precise and certain reasons for preserving" the confidentiality of the documents. 619 F.2d at 226 (internal quotation marks omitted). The current head of USAC is

---

invoke the privilege only where military or diplomatic secrets are concerned[.]" *Id.* "Federal Rule of Evidence 509 . . . has since been deleted by Congress" and is, therefore, no longer applicable. *Smith*, 2017 WL 2937957, at *7 n.7.

Rob DeMartini. *See* Guillermo Rojas, *Rob DeMartini Named CEO of USA Cycling*, USA Cycling (Jan. 7, 2019, 9:00 AM), https://usacycling.org/article/rob-demartini-named-ceo-of-usa-cycling#:~:text=USA%20Cycling.,years%20as%20president%20and%20CEO.   Mr. DeMartini has not been involved in this litigation in any capacity, and USAC has not asserted that he determined the names at issue are privileged. Only USAC's attorneys have asserted the investigatory privilege on behalf of the organization. Because USAC failed to comply with the requisite procedural requirements necessary to assert the investigatory privilege, the court cannot apply the privilege in the instant case.

(d)     The Third Circuit Has Not Extended the Investigatory Privilege to Non-Governmental Entities Like USAC

Even if USAC met the *O'Neill* procedural requirements, the court would not extend this privilege to it for two reasons: first, USAC is not affiliated with the government in any capacity, and, second, USAC does not perform any investigations.

The investigatory privilege is "the *government's* privilege to prevent disclosure of certain information whose disclosure would be contrary to the public interest." *Frankenhauser*, 59 F.R.D. at 342 (emphasis added). There is no precise definition for how far executive privileges extend. In the specific context of the *Frankenhauser* investigatory privilege, courts in this circuit have considered extending the privilege to the Securities and Exchange Commission ("SEC"), *see Hunter v. Heffernan*, No. CIV. A. 94-5340, 1996 WL 363842, at *3 (E.D. Pa. June 28, 1996) (concluding that "[t]he public interest and balance of *Frankenhauser* factors weigh against disclosure of any of the requested information which is not demonstrably important to plaintiff's case"), and the Pennsylvania State Ethics Commission. *Snyder v. Bender I*, Civ. No. 1:09-CV-927, 2011 WL 1135539 (M.D. Pa. Mar. 25, 2011); *Snyder v. Bender II*, Civ. No. 1:09-CV-927, 2011

WL 1357517 (M.D. Pa. Apr. 11, 2011) (concluding "that the balancing of [*Frankenhauser*] factors favors disclosure of this information").

If the court had to determine whether the *Frankenhauser* investigatory privilege applies to the Center for SafeSport, these examples would be illuminating, because the Center for SafeSport is quasi-governmental insofar as Congress created it and the Department of Justice provides a portion of its funding. *See* 26 U.S.C. § 220541 ("Designation of United States Center for Safe Sport"); *FAQs*, U.S. Center for SafeSport, https://uscenterforsafesport.org/response-and-resolution/faqs-and-helpful-links/ (responding that "Congress" is one of funding sources); *see also* Rick Maese, *Olympic Sexual Abuse Prevention Center Needs Federal Funding Help, USOC Chief Says*, The Washington Post, https://www.washingtonpost.com/sports/2019/05/23/olympic-sex-abuse-prevention-center-needs-federal-funding-help-usoc-chief-says/ ("Last year the SafeSport center was given a three-year, $2.2 million grant from the Department of Justice."). However, the question before the court is not whether this privilege extends to the Center for SafeSport, but, rather, whether the privilege extends to USAC. USAC is an independent organization that Congress had no role in creating and that "receives absolutely no government funding." *Who We Are*, USA Cycling, https://usacycling.org/about-us.

Additionally, USAC is not tasked with conducting investigations. Rather, Congress endowed the Center for SafeSport with the power to "establish mechanisms that allow for the reporting, investigation, and resolution . . . of alleged sexual abuse in violation of the Center's policies and procedures[.]" 36 U.S.C. § 220541(a)(4). Congress additionally mandated that the Center for SafeSport impose "a requirement that all adult members of a national governing body," like USAC,

> report immediately any allegation of child abuse of an amateur athlete who is a
> minor to . . . the Center whenever such members or adults learn of facts leading

them to suspect reasonably that an amateur athlete who is a minor has suffered an incident of child abuse . . . and . . . law enforcement . . . .

36 U.S.C. § 220542. Congress does not deputize USAC to perform any sort of investigation. Rather, Congress compels USAC to rely on reasonable suspicion and then turn that reasonable suspicion over to the Center for SafeSport to investigate.[12] The Center for SafeSport also does not task USAC and other national governing bodies with investigations. Rather, the Center gives national governing bodies no discretion to investigate a matter and determine its credibility. The Center's Code mandates that "[i]f the possibility of sexual misconduct under the *Code* is first disclosed to a Covered Adult at [a national governing body] that Covered Adult ***must*** promptly report the possibility of sexual misconduct, in writing, to the Office." Def.'s Mem. in Opp'n to Objs., Ex. A at 2, Doc. No. 91-1 (emphasis in original). The Code dictates that these mandatory reporters at national governing bodies and in the rest of the community "should not investigate, or attempt to evaluate the credibility or validity of allegations involving sexual misconduct, as a condition of reporting to the Office." *Id.* (emphasis omitted).

Even USAC recognized that it was not its place to investigate. In the article that is at the center of this case Jonathan Whiteman indicated that USAC did not "mak[e] any determination of validity before reporting it to the U.S. Center for SafeSport." Def. USA Cycling, Inc.'s Mot. for Summ. J., Ex. L at ECF p. 5, Doc. No. 51-14. Because USAC did not have the power to investigate these claims, the investigatory privilege does not apply.

---

[12] At oral argument, the plaintiff relied heavily on *Fruchtman v. Town of Dewey Beach*, 886 F. Supp. 2d 427 (D. Del. 2012) to support the contention that the *Frankenhauser* privilege is inapplicable because USAC is not tasked with performing investigations. The court does not rely on this case for two reasons. First, in *Fruchtman*, a small-town mayor invoked the "informer's privilege," which is distinct from the privilege at issue in this case insofar as it is "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Id.* at 428 (emphasis, citation, and internal quotation marks omitted). Second, the *Fruchtman* court did not extend the informer's privilege to the mayor because the mayor was not "charged with enforcement of [the] law" and had "no statutory obligation to investigate a complaint once received[.]" *Id.* Here, USAC has *some* statutory obligation, albeit not a statutory obligation to investigate.

ii.     *The SSAA Does Not Establish a Privilege*

The SSAA does not render the names of the alleged victims and reporters privileged because the SSAA is not a privilege. Under Federal Rule of Evidence 501:[13]

> The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
> - the United States Constitution;
> - a federal statute; or
> - rules prescribed by the Supreme Court.

Fed. R. Evid. 501. However, "[t]he general rules governing privileges in Rule 501 do not apply when otherwise provided by Act of Congress." 23A Wright & Miller, *Federal Practice and Procedure* § 5437 (Apr. 2020 Update).

The purported SSAA privilege does not derive from the Constitution or a rule prescribed by the Supreme Court. Therefore, the court's analysis of why the SSAA does not establish a privilege focuses on whether the statute itself (as an "Act of Congress") or the common law circumscribe a privilege.

(a)     The Statute Itself Does Not Establish a Privilege

The SSAA renders the identities of the reporters and alleged victims confidential, but confidentiality does not equate to privilege. *See* 23A Wright & Miller, *Federal Practice and Procedure* § 5437 ("[T]he better view" of statutes concerned with confidentiality "would seem to

---

[13] The court employs a federal analysis. "Federal courts are to apply federal law of privilege to all elements of claims except those 'as to which State law supplies the rule of decision.'" *Pearson*, 211 F.3d at 66 (quoting Fed. R. Civ. P. 501). The plaintiff's three claims—defamation, intrusion upon seclusion, and false light—are claims "as to which State law supplies the rule of decision." *Id.* However, the parties' arguments do not allude to any state law privileges that the court ought to apply in this case. Rather, their arguments are solely rooted in whether a federal common law privilege applies (the investigatory privilege) and whether a federal statute (the SSAA) creates a privilege. USAC analogizes the SSAA to protections afforded to mandatory reporters under Pennsylvania state law. *See* Def.'s Resp. to Mot. to Compel at 10 ("Under the Child Protective Services Law, for example, the release of information that would identify 'the person who made a report of suspected child abuse . . . is prohibited' unless such information is provided to law enforcement officials." (quoting 23 Pa. C.S. § 6340(c)). USAC does not argue that these state law protections apply to those who reported to the Center for SafeSport. Because state law protections are only "relevant" "to the extent that federal law may recognize the force of those provisions," the court employs a federal analysis and relies on Rule 501 as its guide. *Pearson*, 211 F.3d at 61.

be that the statutes themselves create no exception to the judicial control of privilege under the general standard in Rule 501."). The SSAA provides, in relevant part, that the Center for SafeSport shall "ensure that the mechanisms" for reporting, investigation, and resolution of alleged sexual abuse "provide fair notice and an opportunity to be heard and protect the privacy and safety of complainants." 36 U.S.C. § 220541(a)(5). The SSAA also tasks the Center for SafeSport with developing "a mechanism by which a national governing body or paralympic sports organization can . . . share confidentially a report of suspected child abuse of an amateur athlete who is a minor by a member of a national governing body . . . with the Center[.]" 36 U.S.C. § 220542(a)(2)(F)(i).

These provisions of the SSAA are not like federal statutes that "go beyond confidentiality to make the material furnished" inadmissible, such that courts could characterize them as privileges. 23A Wright & Miller, *Federal Practice and Procedure* § 5437. Examples of these statutes include 33 U.S.C. § 930(c), which dictates that worker's compensation reports "shall not be evidence of any fact in any proceeding in respect of such injury or death on account of which the report is made" and 42 U.S.C. § 2240, which forbids any "report by any [atomic energy] licensee of any incident arising out of or in connection with a licensed activity made pursuant to any requirement of the Commission" from being "admitted as evidence in any suit or action for damages growing out of any matter mentioned in such a report." These provisions are clear and specific. The SSAA contains no such specific language pertaining to the inadmissibility of evidence in court proceedings.

USAC argues that the SafeSport Code, rather than the SSAA, establishes the privilege. Def.'s Mem. in Opp'n to Objs. at 9 (pointing to provision of Code which establishes "[t]he Office will not identify or use the name of a Third-party Reporter. Nor will it publicly release a Reporting Party's identifying information" (citing to Code App. A, § II(A)(2)(d)). However, "administrative

regulations purporting to create a privilege or otherwise barring judicial access to evidence" do not create a privilege, because "Congress has not given administrative tribunals any power to create privileges that are binding on courts." 23A Wright & Miller, *Federal Practice and Procedure* § 5437.

(b)     The Common Law Does Not Establish a Privilege

Federal Rule of Evidence 501 empowers the courts to "define new privileges by interpreting common law principles ... in the light of reason and experience." *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (alteration in original) (internal quotation marks omitted). "[A]lthough Rule 501 manifests a congressional desire not to freeze the law of privilege but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, [federal courts] are disinclined to exercise this authority expansively." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (internal quotation marks and citation omitted); *see also Pearson*, 211 F.3d at 67 (collecting cases which demonstrate "with very limited exceptions, federal courts have generally declined to grant requests for new privileges). Though the federal courts "obviously have authority to develop and modify the common law of privileges, [they] should be circumspect about creating new privileges based upon perceived public policy considerations" particularly when "the legislative branch is better equipped to evaluate" those concerns. *In re Grand Jury*, 103 F.3d 1140, 1154 (3d Cir. 1997).

Mindful of this necessary reticence in creating a new privilege, there are "two principal features" for a court to consider when deciding whether to recognize a new privilege. *Pearson*, 211 F.3d at 66. First, the "privilege 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *Id.* at 67 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). Second, the privilege does not "impede access to probative evidence." *Id.* This second feature is

23

"granted very significant weight" because it is "'a fundamental maxim that the public ... has a right to every man's evidence.'" *Id.* (quoting *Jaffee*, 518 U.S. at 9) (alteration in original).

In examining whether the supposed SSAA privilege embodies these two features, the court looks to the Third Circuit's decision in *Pearson*. In *Pearson*, a mother alleged that a foster child under the supervision of Luzerne County Children and Youth Services, Inc. and KidsPeace National Centers for Kids in Crisis, Inc. assaulted her daughter who was also in foster care. *Id.* at 60–61. The mother sought to establish that "the defendant agencies had knowledge" of the alleged perpetrator's "violent sexual propensities sufficient to establish their liability for assault." *Id.* at 61. The defendants refused to turn over "discovery of material that might evidence such knowledge" contending "that such discovery would violate the confidentiality of that information in breach of an array of Pennsylvania statutes," including the Child Protective Services Law. *Id.*

In regard to the first principal feature, the court noted that there were a number of interests at stake in preserving the confidentiality of the information. *Id.* at 71. Such confidentiality "is crucial to [the] maximal effectiveness" of the law. *Id.* However, the court determined that asserted privilege did not embody the second principal feature, because its unwieldy nature might impede access to evidence and make it challenging for courts to apply the privilege. *Id.* As the court noted, "the number and variety of interests" at stake rendered the statute a "poor candidate[] for the protection of a Rule 501 privilege." *Id.* Unlike most privileges which are "ordinarily found in bilateral confidential relations," a privilege protecting information covered by the Child Protective Services Law would apply to "[c]omplex multilateral privileges[.]" *Id.* Such complexity would render the privilege "extremely broad and unwieldy to enforce" because "the privilege could not be waived without the consent of all the potentially vast numbers of 'holders' of the privilege[]" and it "would essentially be unwaivable." *Id.*

As a possible remedy, the court considered "view[ing] such a privilege as held by the state on behalf of all of those who have interests in confidentiality under the statute[]." *Id.* However, the court concluded such a privilege "would remain a poor fit for the framework of Rule 501" because "those who would benefit from the privilege would lack the power to control its application" if only the state could waive it. *Id.* For these reasons, the court found "that Rule 501 is unsuited for the kind of privilege that" the defendants sought, and, instead, indicated the district court "should entertain requests for protective orders under Federal Rule of Civil Procedure 26(c) and impose such restrictions upon discovery as it deems appropriate." *Id.* at 74.

This court concludes "that Rule 501 is unsuited for the" SSAA privilege for reasons similar to *Pearson*. The court recognizes that the anonymity of reporters and victims of alleged sexual assault is very important. This concern is particularly important in the context of the SSAA, given the knowing silence of those at USA Gymnastics that enabled Larry Nassar to prey on young gymnasts for years. *See* Def.'s Resp. to Mot. to Compel at 10 n.3 (citing Sarah Fitzpatrick, *Congress: U.S. Olympic Committee, FBI Failed to Protect Athletes From Larry Nassar's Abuse*, NBC News, July 30, 2019, https://www.nbcnews.com/politics/congress-u-s-olympic-committee-fbi-failed-protect-athletes-larry-n1035751). However, the SSAA privilege is similar to the asserted *Pearson* privilege in its unwieldy nature. There are many players who could constitute the "holders" of the privilege. These include: the reporters and alleged victims, USAC, and the Center for SafeSport. If the court tried to construe the SSAA privilege as a multilateral privilege, it "would essentially be unwaivable" because of the many holders of the privilege. *Pearson*, 211 F.3d at 71. In the pending motion, USAC seeks to bifurcate the privilege, asserting it on behalf of the alleged reporters and victims. Nonetheless, "[b]ecause of the inherent difficulties with such bifurcated privileges . . . they are very rare indeed." *Id.* at 71 n.16.

Given these concerns, "[t]he legislature, not the judiciary, is institutionally better equipped to perform the balancing of the competing policy issues required in deciding whether the recognition" of an SSAA privilege "is in the best interests of society." *In re Grand Jury*, 103 F.3d at 1154. Further, Congress had the opportunity to draft a statutorily proscribed privilege when it drafted the SSAA but chose not to do so. "We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Univ. of Pa*, 493 U.S. at 189 (citation omitted).

b.   A Protective Order Is Appropriate

Although the court concludes that the identities of the reporters are not privileged, "a far more appropriate mechanism" than a privilege "exists for protecting the legitimate interests at stake: namely, a Rule 26(c) protective order." *Pearson*, 211 F.3d at 69. Typically, non-privileged information is discoverable, however "[t]he presumption that such matter is discoverable . . . is defeasible" because "Rule 26(c) grants federal judges the discretion to issue protective orders that impose restrictions on the extent and manner of discovery where necessary 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *Pearson*, 211 F.3d at 65 (quoting Fed. R. Civ. P. 26(c)).

A protective order is only applicable when the party seeking the protective order "show[s] good cause by demonstrating a particular need for protection." *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984) (internal citation omitted). "The injury shown, however, need be no more than 'embarrassment'; thus, a party need not establish a monetizable injury." *Pearson*, 211 F.3d at 73 (citation omitted).

The court agrees with Judge Heffley that "the highly sensitive nature of" the identities of the reporters and alleged victims "far outweighs the marginal relevance that the identity of these individuals may have on Plaintiff's ability to prove his claims against [USAC], including any alleged malice on the part of [USAC]." June 5, 2020 Order at 2. On one side of the scale, the court places the possible harm to the concerned parties. This side of the scale is heavy. The reporters and alleged victims may face some reputational concern and retaliation if the court compels USAC to reveal their identities. *See* Def.'s Resp. to Mot. to Compel at 13.[14] Additionally, the Center for SafeSport may face an undue burden if the court forces USAC to disclose these identities, because fewer people may feel comfortable coming forward to discuss allegations of sexual assault with the Center. Def.'s Mem. in Opp'n to Objs. at 9. The Center explained in its amicus brief that this "risk is not hypothetical." Amicus Curiae Br. at 10, Doc. No. 57. "Over the past six months . . . , the Center has seen this risk play out in active investigations" when witnesses participating in an investigation received cease and desist letters from a respondent's attorney. *Id.*

On the other side of the scale, the court places the plaintiff's need for this information. This side of the scale barely tips downward. The plaintiff's need for these identities is negligible. Two of the plaintiff's claims require that he establish actual malice. However, the only defendant in this case is USAC. The identities of these alleged reporters and victims is not germane to establishing whether USAC acted with actual malice.[15]

---

[14] This court makes no decision about whether the plaintiff has some sort of personal "vendetta" to settle against these reporters and alleged victims. *Id.*

[15] During oral argument, counsel for the plaintiff used examples to try and elucidate the point that these identities could demonstrate USAC acted with actual malice. Counsel claimed that if, for example, one of the reporters was the plaintiff's opponent in his ongoing race for the United States House of Representatives, the reporter would have an obvious bias. Therefore, in publishing information concerning these allegations, USAC acted with actual malice by recklessly disregarding the truth.

      However, even if this outlandish example were reality, it would not demonstrate that USAC acted with actual malice. The plaintiff claims that USAC's statements to *The Morning Call* constitute defamation. Those statements were as follows: (1) USAC received a complaint concerning the plaintiff; (2) USAC forwarded the complaint to SafeSport; (3) before referring the complaint, USAC "gathered enough specificity to allege a policy has been

As USAC has shown good cause for the need to protect the identities of the reporters and alleged victims in this case, the issuance of a protective order regarding those identities is appropriate and Judge Heffley did not err in determining that USAC properly redacted the identities.

### 2.     The Plaintiff's Second Objection: The Claw Back

During a deposition of a witness for USAC, it "inadvertently produced one document that contained the first name of a reporter of sexual abuse." Def.'s Mem. in Opp'n to Objs. at 2. USAC claims it "properly clawed back" the name "on the record, during the deposition[.]" Def.'s Resp. to Mot. to Compel at 3, 5. Judge Heffley concluded that this claw back was proper. *See* June 5, 2020 Order at 3 ("The undersigned finds that [USAC's] claw back of the identity of a reporter of alleged sexual abuse that was inadvertently disclosed during discovery was proper."). The plaintiff argues that Judge Heffley erred and that USAC improperly clawed back the reporter's identity because the name was not privileged material. Pl.'s Objs. at 9. The court finds that the claw back was improper, because there was no basis for it insofar as the identities of the reporters are not subject to privilege and the stipulated protective order did not contain a claw-back provision concerning inadvertent disclosures.

First, the court turns to the question of privilege. In analyzing whether a party can claw back material, the court looks to Federal Rule of Civil Procedure 26(b)(5)(B) and Federal Rule of Evidence 502. Rule 26(b)(5)(B) applies to "information produced in discovery [that] is subject to a claim of privilege or of protection as trial-preparation material[.]" Fed. R. Civ. P. 26(b)(5)(B).

---

violated"; and (4) the "allegation . . . included sexual misconduct." Compl. at ¶ 38, Doc. No. 1. None of these four statements hinge on the truth of the reporter's statements. If the plaintiff's contention is that USAC made statement three with actual malice because USAC had not *actually* gathered enough specific information to allege a policy violation, because its sources were not credible, the plaintiff does not need the names of the reporters to make such an argument. Rather, the plaintiff needs to show that USAC did not *believe* that it had gathered enough specificity to allege a policy violation. Such information would be readily available in this version of the record, which only lacks the names of the alleged reporters and victims, not USAC's evaluation of the situation and its report to SafeSport.

Similarly, Rule 502 only applies to attorney-client privilege and work product privilege. *See* Fed. R. Evid. 502 ("The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client or work-product protection."). As discussed above, this material is not subject to attorney-client privilege, nor does it fall under the work-product protection, therefore neither of these rules applies to protect this information.

Second, the court examines whether the stipulated protective order and the confidentiality stipulation apply to the first name of the reporter. The stipulated protective order dictates the way in which a party can designate a document confidential such that the information "shall be used solely for the purpose of conducting the above-captioned litigation and shall not be disclosed to anyone other than a person qualified under the terms of" the stipulated protective order and provides a protocol in the instance that "a party disagrees at any stage of these proceedings with another party's designation of any discovery material as Confidential Material." Stipulated Protective Order at 2, 3, Doc. No. 18. Those qualified to receive the confidential information include, among others, "the attorneys working on this action"; "the parties, their employees, officers, and agents who are working on this action"; and "any witness in this litigation who is deposed or questioned, provided that such witness may not retain the Confidential Material after the use has ended." *Id.* at 2. The order does not prevent the plaintiff or counsel for the plaintiff from obtaining any information from USAC.

The confidentiality order indicates that "[t]he inadvertent disclosure of Confidential Material by any party shall not be construed as a waiver of confidentiality." Confidentiality Stipulation at ¶ 8, Doc. No. 31. However, like the stipulated protective order, the confidentiality stipulation permits that "[a]ll Confidential Material shall be treated as confidential and shall not be disclosed to any person other than . . . [c]ounsel for the parties in this case" and "[t]he parties

and those officers, directors, partners and managing agents of a party who are charged with controlling this action on behalf of that party[.]" *Id.* at ¶ 5. Therefore, the confidentiality order also does not prevent the plaintiff or counsel for the plaintiff from obtaining any information from USAC.

USAC had no basis for clawing back the first name it inadvertently disclosed during Mr. Whiteman's deposition. Judge Heffley resolved this matter in a very succinct order, so this court does not analyze her decision beyond her conclusion. *See* June 5, 2020 Order at 3. Because this court cannot discern how this material is privileged or was covered by the original stipulated protective order, the court finds that the decision was contrary to law.

The court notes that there is no way for the plaintiff to effectively use this name in regard to the pending motion for summary judgment. The plaintiff does not know the reporter's last name. Therefore, any claims regarding the person's identity would amount to "bare assertions, conclusory allegations, or suspicions" and would be insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

## IV.   CONCLUSION

The court denies the plaintiff's first objection and finds that USAC need not disclose the redacted names of the alleged reporters and victims because those identities are subject to a protective order under Rule 26(c). The court grants the plaintiff's second objection and finds that there was no basis for USAC clawing back the name, so the claw back was improper.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

30