IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARTIN W. NOTHSTEIN,                  :
                                      :
                    Plaintiff,        :          CIVIL ACTION NO. 19-1631
                                      :
            v.                        :
                                      :
USA CYCLING,                          :
                                      :
                    Defendant.        :

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                    November 5, 2020

The plaintiff, an Olympic cyclist and local politician, brings defamation, invasion of privacy—false light, and invasion of privacy—intrusion upon seclusion claims against the defendant, the national governing body of cycling in the United States. In 2018, the defendant learned of sexual assault allegations involving the plaintiff. The defendant reported these allegations to the United States Center for SafeSport—a congressionally-established entity tasked with investigating allegations of sexual abuse in Olympic and Paralympic sports. After reporting these allegations to the Center, the defendant disclosed information about the plaintiff, which the plaintiff contends renders the defendant liable in this action. First, the defendant suspended the plaintiff's cycling license, which placed him on a list of suspended riders that was available to some members of the cycling community. Second, the defendant gave a local newspaper a succinct statement confirming that there was an ongoing investigation into sexual misconduct allegations involving the plaintiff.

The defendant has now moved for summary judgment on all the plaintiff's claims. After reviewing the parties' submissions and the complaint, the court grants the defendant's motion for summary judgment. In regard to placing the plaintiff on the list of suspended riders, the court

concludes that the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 ("SSAA"), 36 U.S.C. § 220541, limits the defendant's liability and renders the defendant immune to liability for placing the plaintiff on the list of suspended riders. In regard to making statements to the newspaper, the court concludes that the plaintiff has not demonstrated there is any genuine issue of material fact that could render the defendant liable for defamation, invasion of privacy—false light, or invasion of privacy—intrusion upon seclusion.

## I.    PROCEDURAL HISTORY

The plaintiff, Martin W. Nothstein, filed a complaint against the defendant, USA Cycling, Inc. ("USAC"), on March 28, 2019, in the Lehigh County Court of Common Pleas. Notice of Removal, Ex. B at 12–28, Doc. No. 1. In the complaint, the plaintiff alleges that he "is the most highly decorated track cycling athlete the United States has ever produced, winning a Silver Medal at the Atlanta Olympics in 1996, a Gold Medal at the Sydney Olympics in 2000, and three separate World Championships. Compl. at ¶ 4. He is a Lehigh Valley native, who "has also enjoyed and maintained an impeccable reputation of the highest caliber in the Lehigh Valley and its environs." *Id.* at ¶¶ 6, 7.

While serving as Chairman of the Lehigh County Board of Commissioners, he "declared his candidacy for the newly formed Seventh Congressional District" on October 19, 2017. *Id.* at ¶ 10. Approximately 11 days after this declaration, "an 'anonymous tipster' contacted [USAC] and apparently accused [the plaintiff] of engaging in sexual misconduct eighteen (18) years ago, in or about 2000 during the Olympic Games in Sydney, Australia." *Id.* at ¶ 11. The plaintiff asserts that this report was suspicious because (1) it "surfaced over 18 years after the fact and a few days after [he] declared his candidacy for a hotly contested U.S. Congressional seat," and (2) "the report was not made by the victim of the alleged misconduct, but rather came from a third-party who

apparently refused to reveal his or her identity." *Id.* at ¶¶ 14–16. This anonymous report was eventually revealed to be a "total fabrication" because the alleged victim, upon learning of the accusations, submitted an affidavit denying that the plaintiff ever committed the acts alleged by the anonymous reporter. *Id.* at ¶¶ 17, 18.

The plaintiff acknowledges that USAC was obliged to turn over the report of alleged sexual misconduct to the United States Center for SafeSport (the "Center"), which is "a federal entity created by Congress to field and investigate any reports of sexual misconduct levied against any member or affiliate of an Olympic national governing body." *Id.* at ¶ 19. While the Center was conducting its investigation, the plaintiff claims that USAC defamed him "by leaking information about the report and investigation to the media and falsely reporting on its website that [he] had been suspended for 'disciplinary' reasons." *Id.* at ¶ 20. He also alleges that USAC should have kept the anonymous report confidential as required by the International Olympic Committee's "Framework For Safeguarding Athletes and Other Participants from Harassment and Abuse in Sport."[1] *Id.* at ¶¶ 21–22. In addition, he avers that USAC violated the privacy provisions of the "SafeSport Practices and Procedures for U.S. Olympic and Paralympic Movement." *Id.* at ¶ 23.

Based on the aforementioned allegations, the plaintiff asserts three causes of action against USAC: (1) defamation, (2) invasion of privacy—false light, and (3) invasion of privacy—intrusion upon seclusion. *Id.* at 7, 10–11. On April 15, 2019, USAC removed the case from the Court of Common Pleas to this court pursuant to 28 U.S.C. §§ 1332 and 1446. Notice of Removal at ¶¶ 6, 16.

After removing the case, USAC filed a motion to dismiss for failure to state a claim on April 22, 2019. Doc. No. 2. The plaintiff filed a response in opposition to the motion on May 16,

---

[1] The plaintiff alleges that this framework applies to USAC because it is a member of the U.S. Olympic Committee, which in turn is member of the International Olympic Committee. Compl. at ¶ 21.

2019. Doc. No. 5. USAC filed a reply to the response to the motion on May 31, 2019. Doc. No. 8. The court held oral argument on the motion on June 4, 2019. Doc. No. 10. On the same date, the court denied the motion to dismiss. Doc. No. 11.

The discovery process was particularly robust in this case. The court referred all discovery disputes to United States Magistrate Judge Marilyn Heffley as discovery master. Doc. Nos. 42, 69, 79. The most contentious discovery disputes between the parties centered around whether the plaintiff could have access to unredacted documents that bore the names of alleged reporters and victims of sexual abuse and around whether USAC could claw back one of the names it had inadvertently disclosed to the plaintiff during a deposition. *See* Doc. Nos. 63, 66, 75, 77, 81; *see also* Oct. 19, 2020 Mem. Op., Doc. No. 98. This dispute resulted in the plaintiff filing a motion to compel, which USAC opposed. *See* Doc. Nos. 63, 75.

On June 5, 2020, Judge Heffley issued an order denying the plaintiff's motion to compel the production of the unredacted documents and finding USAC properly clawed back the inadvertently disclosed name, and, therefore, the plaintiff could not reference the name in this litigation. Doc. No. 82. The plaintiff objected to these portions of Judge Heffley's decision on June 19, 2020. Doc. No. 85. USAC responded in opposition to these objections on July 6, 2020. Doc. No. 91. The plaintiff filed a reply brief in support of the objections on July 31, 2020. Doc. No. 95. The court heard oral argument on the objections on August 4, 2020. Doc. No. 96. On October 7, 2020, the court upheld Judge Heffley's decision that USAC need not turn over the unredacted documents, but determined that USAC's claw back was improper. *See* Mem. Op. at 30; Order at 2, Doc. No. 99.

The parties litigated the instant motion for summary judgment in the midst of this lengthy discovery dispute. USAC filed the motion for summary judgment on April 13, 2020. Doc. No. 51.

The Center filed a motion to file an *amicus* brief on April 17, 2020. Doc. No. 55. The court granted

the motion, Doc. No. 56, and the Center submitted an amicus brief to the court on April 20, 2020.

Doc. No. 57. After receiving an extension, the plaintiff filed his response in opposition to the

motion for summary judgment on May 11, 2020. Doc. Nos. 58, 61. The defendant filed a reply

brief in support of the motion for summary judgment on May 18, 2020. Doc. No. 67. The court

held oral argument on the motion for summary judgment with counsel for the parties and counsel

for the Center on June 22, 2020. The motion is ripe for disposition.

## II.    FACTUAL BACKGROUND

The uncontested facts are as follows. The plaintiff is a well-known celebrity, public figure,

public official, and decorated two-time Olympic track cycling athlete. Def. USA Cycling's

Statement of Facts Not in Dispute ("Def.'s Facts") at ¶¶ 1–2, Doc. No. 51-1; Pl. Martin W.

Nothstein's Resp. to Def. USA Cycling's Statement of Facts Not in Dispute and Counter-

Statement of Material Facts Not in Dispute ("Pl.'s Resp.") at ¶¶ 1–2, Doc. No. 61.[2] After he retired

from racing, the plaintiff began working for the Valley Preferred Cycling Center, formerly known

as the Lehigh Valley Velodrome ("Velodrome"), and eventually rose through the ranks to become

the Executive Director of the Velodrome. Def.'s Facts at ¶ 3; Pl.'s Resp. at ¶ 3.

The plaintiff ventured beyond the cycling track and into the political arena when he won a

seat on the Lehigh County Board of Commissioners 2015 and was named Chairman of the Board

in 2017. Def.'s Facts at ¶¶ 5–6; Pl.'s Resp. at ¶¶ 5–6. On October 19, 2017, the plaintiff declared

his candidacy for the United States House of Representatives, seeking to represent the newly

formed Seventh Congressional District of Pennsylvania and to fill a seat previously held by long-

time Republican Congressman Charlie Dent. Def.'s Facts at ¶ 7; Pl.'s Resp. at ¶ 7; Pl.'s Counter-

---

[2] The plaintiff's response to USAC's statement of undisputed material facts starts at ECF p. 34 of Doc. No. 61.

Statement of Material Facts ("Pl.'s Counter-Statement") at ¶ 6;[3] Def.'s Resp. to Pl.'s Counter-Statement of Material Facts Not in Dispute ("Def.'s Resp.") at ¶ 6, Doc. No. 67-1. The election was hotly contested. Pl.'s Counter-Statement at ¶ 6; Def.'s Resp. at ¶ 6. Although the plaintiff won the primary election, he lost the general election. Def.'s Facts at ¶ 8; Pl.'s Resp. at ¶ 8.

USAC is the national governing body ("NGB") for bicycle racing in the United States. Def.'s Facts at ¶ 9; Pl.'s Resp. at ¶ 9. Jonathan Whiteman was serving as the USAC Risk Protection Manager and Derek Bouchard-Hall was serving as the President and CEO of USAC in September 2017. Def.'s Facts at ¶¶ 11, 12; Pl.'s Resp. at ¶¶ 11, 12.

Mr. Whiteman claims that in September 2017, Mr. Bouchard-Hall "had become aware of some concerns [relating to sexual harassment or sexual misconduct] that had been brought to his attention regarding [the plaintiff]" Br. of Pl., Martin W. Nothstein, in Opp'n to the Mot. for Summ. J. of Def. USA Cycling ("Pl.'s Opp'n Br."), Ex. B, Dep. of Jonathan Whiteman ("Whiteman Dep.") at 39:17–21, Doc. No. 61-5. Mr. Bouchard-Hall discussed these claims with Mr. Whiteman. Def.'s Facts at ¶ 12; Pl.'s Resp. at ¶ 12. Mr. Whiteman claims that he then reported these claims to Joan Hanscom, USAC's Director of Event Services, who stated the "subject [was] being broadly discussed in the community[.]" Def.'s Facts, Ex. D, Doc. No. 51-6. Over the weekend of October 21—days after the plaintiff announced his Congressional bid on October 19, 2017—an anonymous individual disclosed allegations about the plaintiff's sexual misconduct. Pl.'s Counter-Statement at ¶¶ 15–16; Def.'s Resp. at ¶¶ 15–16. Mr. Bouchard-Hall told Mr. Whiteman that it was important to "keep[] this initial inquiry as confidential as possible due to the sensitive nature of Nothstein's public life and recent candidacy for US Congress." Pl.'s Counter-Statement at ¶ 23; Def.'s Resp. at ¶ 23; Whiteman Dep. at 61:25–66:23; Pl.'s Opp'n Br., Ex. F, Doc. No. 61-9.

---

[3] The plaintiff's counter-statement of undisputed material facts starts at ECF p. 50 of Doc. No. 61.

The Center is the entity charged with investigating allegations of abuse against amateur athletes. Def.'s Facts at ¶ 31; Pl.'s Resp. at ¶ 31. Mr. Whiteman submitted a report to the Center on November 1, 2017. Def.'s Facts at ¶ 32; Pl.'s Resp. at ¶ 32. Mr. Whiteman does not recall directly speaking to any of the alleged sexual assault victims while he gathered information about the allegations pertaining to the plaintiff. Pl.'s Counter-Statement at ¶ 20; Def.'s Resp. at ¶ 20. Mr. Whiteman did not speak with the plaintiff regarding the allegations. Pl.'s Counter-Statement at ¶ 22; Def.'s Resp. at ¶ 22. In the report to the Center, Mr. Whiteman claimed to have spoken with a "third-party reporter who wish[ed] to remain anonymous," but who communicated to Mr. Whiteman that "a freelance journalist ha[d] been in contact with him and many others that frequented the Valley Preferred Cycling Center in Trexlertown, PA during the 1990s" and indicated that the freelance journalist "mentioned there ha[d] been allegations made about sexual harassment, sexual misconduct and sexual relationships . . . towards Marty Nothstein." Def.'s Facts, Ex. I, Doc. No. 51-11. The report claims that multiple reporters corroborated these allegations. *Id.*

As a national governing body, USAC is required to adhere to the Center's Rules and Regulations. Pl.'s Counter-Statement at ¶ 24; Def.'s Resp. at ¶ 24. The Center's Rules and Regulations contain a privacy provision which provides:

> Information will be shared only as necessary with investigators, witnesses and the Responding Party. It will be necessary for the Office to (a) notify the NGB of an allegation involving a Covered Individual from that NGB, (b) if the Office seeks an interim measure, (c) if the Office proceeds to a full investigation, and (d) any final decision regarding whether a violation occurred and sanctions, if any. But the Office will not disclose the identity of a Reporting Party to the NGB unless necessary to the case.

Pl.'s Counter-Statement at ¶ 26; Def.'s Resp. at ¶ 26; Pl.'s Opp'n Br., Ex. H, U.S. Center for SafeSport, SafeSport Code for the U.S. Olympic and Paralympic Movement ("SafeSport Code") at ECF p. 48, Doc. No. 61-11.

The Center opened a formal investigation in February 2018. Def.'s Facts at ¶ 36; Pl.'s Resp. at ¶ 36. Mr. Whiteman placed the plaintiff's USAC account on administrative hold, which restricted his ability to purchase a license and placed him on an internal USAC list as a rider who was unauthorized to ride. Def.'s Facts at ¶¶ 38–40; Pl.'s Resp. at ¶¶ 38–40. The information revealed on the list was limited to the plaintiff's name ("Marty Nothstein"), license number, reason for the hold (categorized as "disciplinary"), the beginning date of the hold ("2018-02-09"), and the end date of the hold ("Indefinite"). Pl.'s Opp'n Br., Ex. L, Doc. No. 61-15. The list is not available to the general public. Def.'s Facts at ¶ 42; Pl.'s Resp. at ¶ 42. Mr. Whiteman claims that he did not realize the administrative hold would place the plaintiff's name on this list. Def.'s Facts at ¶ 40; Whiteman Dep. at 124:6–125:12 ("I did not put him on that list, no."). In March 2018, Mr. Whiteman removed the administrative hold on the plaintiff's account, thereby removing him from the list, at the urging of Mr. Bouchard-Hall. Def.'s Facts at ¶ 46; Pl.'s Resp. at ¶ 46; Pl.'s Opp'n Br., Ex. M, Doc. No. 61-16.

In February 2018, the plaintiff procured two affidavits from alleged victims of his sexual misconduct. On February 17, 2018, one alleged victim swore in a notarized affidavit that a SafeSport investigator questioned her about alleged sexual abuse by the plaintiff. Pl.'s Opp'n Br., Ex. E, Doc. No. 61-8. She told the investigator the "allegation was false" and she was never "inappropriately touched or otherwise involved in any relationship of a sexual nature with" the plaintiff "at any time in her life[,] either as a minor under the age of 18 or as an adult." *Id.*; Pl.'s Counter-Statement at ¶ 21; Def.'s Resp. at ¶ 21. On February 19, 2018, another alleged victim

swore in a notarized affidavit that a SafeSport investigator had contacted her to ask about alleged sexual abuse. Pl.'s Opp'n Br., Ex. E. She similarly swore that she was "never . . . the victim of any inappropriate conduct as a minor or as an adult by" the plaintiff. *Id.*; Pl.'s Counter-Statement at ¶ 21; Def.'s Resp. at ¶ 21.

In May 2018, a reporter from *The Morning Call* contacted Mr. Whiteman about the plaintiff. Def.'s Facts at ¶ 53; Pl.'s Resp. at ¶ 53. After consulting with USAC leadership, Mr. Whiteman told the reporter that USAC received a complaint about the plaintiff and reported the complaint to the Center. Def.'s Facts at ¶ 54; Pl.'s Resp. at ¶ 54. Mr. Whiteman sent an email to the reporter on May 24, 2018, stating that he wanted "to make one detail clear: When receiving allegations of sexual misconduct, USA Cycling makes no determination of the validity of the allegation before reporting it to the U.S. Center for SafeSport." Pl.'s Counter-Statement at ¶ 32; Def.'s Resp. at ¶ 32; Pl.'s Opp'n Br., Ex. I, Doc. No. 51-12.

On August 17, 2018, the *Morning Call* published an article about the SafeSport investigation titled "Lehigh Valley velodrome board put Pennsylvania congressional candidate Marty Nothstein on leave after sexual misconduct allegation." Def.'s Facts at ¶ 55; Pl.'s Resp. at ¶ 55; Def.'s Facts, Ex. L, Doc. No. 51-14. The article said the following about the author's interview with Mr. Whiteman:

> Jonathan Whiteman, a USA Cycling risk protection manager who fields abuse claims, said his office received the complaint about Nothstein on Oct. 30. That was 11 days after Nothstein publicly announced his bid for Congress.
>
> Whiteman forwarded it to SafeSport on Nov. 1. Before referring it, Whiteman said he gathered "enough specificity to allege a policy has been violated," as is required.
>
> "What I can confirm is USA Cycling received an allegation involving Marty Nothstein that included sexual misconduct," Whiteman said in a May phone interview. "When USA Cycling receives an allegation of sexual misconduct, we are not making any determination of validity before reporting it to the U.S. Center for SafeSport."

Def.'s Facts, Ex. L. Mr. Whiteman denies that he told the reporter that the allegations included sexual misconduct. *Id.* at ¶ 56; Pl.'s Resp. at ¶ 56. Mr. Whiteman did not contact the reporter to request a retraction or deletion of his quote. Pl.'s Counter-Statement at ¶ 36; Def.'s Resp. at ¶ 36.

In October 2018, the plaintiff filed a lawsuit against the Velodrome; then-President of the Velodrome Board, Andy Ralston; and *The Morning Call* in the Court of Common Pleas of Lehigh County. Def.'s Facts at ¶ 57; Pl.'s Resp. at ¶ 57.

## III.     DISCUSSION

### A.     <u>Standard of Review – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this

burden, it is up to the non-moving party to counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence. . . of a genuine dispute"). The non-movant must show more than the "mere scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. "[B]are assertions, conclusory allegations, or suspicions" are insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation and internal quotation marks omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe [them]," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.  Analysis

The plaintiff brings claims of defamation (including defamation *per se*), invasion of privacy—false light, and invasion of privacy—intrusion upon seclusion because USAC allegedly

> a.  falsely publish[ed] on the [USAC] website that [the plaintiff] had been suspended "indefinitely" for "disciplinary" reasons when, in fact, [the plaintiff] had not been suspended and had never been disciplined; and
>
> b.  impl[ied] the existence of false and defamatory facts by making partial, misleading disclosures to the media about the reported incident, without also disclosing the dubious credibility of the report and the fact that the alleged victim had sworn in an affidavit that the allegations were not true.

Compl. at ¶¶ 43(a)-(b).

USAC argues that the court should grant summary judgment to it on the plaintiff's claims because it is immune from such claims under the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 ("SSAA"), 36 U.S.C. § 220541, or, in the alternative, because the plaintiff cannot establish the essential elements of his claims. Br. in Supp. of Def. USA Cycling, Inc.'s Mot. for Summ. J. ("Def.'s Br.") at 10, Doc. No. 51-2. The plaintiff argues that the court should deny the motion for summary judgment because the SSAA does not immunize USAC from liability in this specific context, and because there are genuine issues of material fact with respect to his claims. Pl.'s Opp'n Br. at 1–2. The Center submitted an amicus brief to the court

arguing that the SSAA provides a broad limitation on liability for "any action or communication" that "arises from" the Center's processes and procedures based on the statute's text, legislative history, and policy implications. Amicus Curiae Br. of the U.S. Ctr. for SafeSport on the Scope of § 220541(d) ("Amicus Curiae Br.") at 2, Doc. No. 57.

The court's analysis of the motion for summary judgment proceeds in four parts. First, the court examines whether the SSAA confers immunity on USAC for both putting the plaintiff's name on the list of suspended riders and for providing statements to *The Morning Call*. The court concludes that the SSAA's limitation on liability applies to the act of placing the plaintiff on the list of suspended riders, but not to the statements to *The Morning Call*. Second, third, and fourth, the court examines whether there is a genuine issue of material fact for the plaintiff's defamation, invasion of privacy—false light, and invasion of privacy—intrusion upon seclusion claims. The court concludes that the plaintiff has not established that there is a genuine issue of material fact such that he can overcome the motion for summary judgment on any of these claims.

### 1.    Does the SSAA Confer Immunity on USAC?

In 2017, Congress enacted the SSAA to establish the Center, which is "the independent national safe sport organization . . . for the United States." 36 U.S.C. § 220541(a)(1). The SSAA gives the Center the authority to "exercise jurisdiction" over Olympic and Paralympic sports "with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." *Id.* § 220541(a)(2). In addition to establishing the Center, the SSAA provides a broad overview of the Center's duties. *See Id.* §§ 220541, 220542. The portion of the SSAA upon which the parties' arguments focus is a provision providing a limitation on liability. *See* Def.'s Br. at 12 (discussing limitation on liability provision); Pl.'s Opp'n Br. at 2 ("As set forth herein, the 'Limitation on liability' provision in the SSAA does not provide immunity to Defendant under the

facts of the present case."); Amicus Curiae Br. at 2 (arguing that "Nothstein's interpretation of the limitation on liability is much too narrow" and "the statutory text, legislative history, and policy implications all support a much broader interpretation of this limitation on liability.").

To understand how the limitation on liability applies in this case, the court first examines the statute's text and legislative history. Second, the court analyzes how the statute applies to USAC placing the plaintiff's name on the list of suspended riders and to USAC's statements to *The Morning Call*.

a.      The Statute Itself

i.      *The Text*

The SSAA's limitation on liability provision states:

**(1) In general.--**Except as provided in paragraph (2), an applicable entity shall not be liable for damages in any civil action for defamation, libel, slander, or damage to reputation arising out of any action or communication, if the action arises from the execution of the responsibilities or functions described in this section, section 220542, or section 220543.

**(2) Exception.--**Paragraph (1) shall not apply in any action in which an applicable entity acted with actual malice, or provided information or took action not pursuant to this section, section 220542, or section 220543.

36 U.S.C. § 220541(d)(1)-(2).   An "applicable entity" includes "the Center" and "a national governing body," like USAC. *Id.* § 220541(d)(3).

The limitation patently applies to all portions of the SSAA. *Id.* § 220541(d)(1) (applying limitation on liability provision to actions that "arise[] from the execution of the responsibilities or functions described in [section 220541], section 220542, or section 220543"). Section 220541 contains a provision mandating that the Center "maintain an office for education and outreach that shall develop . . . policies[] and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national

14

governing bodies[.]" *Id.* § 220541(a)(3). These "policies and procedures developed under subsection (a)(3) . . . apply as though they were incorporated in and made a part of section 220524," which outlines the mandatory duties of national governing bodies. *Id.* § 220541(b); *see id.* § 220524 (using "shall" to dictate "[g]eneral duties of national governing bodies"). Section 220542 includes an explicit provision permitting a national governing body to "impose an interim measure to prevent an individual who is the subject of an allegation of sexual abuse from interacting with an amateur athlete prior to the Center exercising its jurisdiction over a matter." *Id.* § 220542(b).

ii.    *Congress's Purpose in Enacting the Statute*

Congress enacted the SSAA after "the Nation was horrified to learn of the decades of abuse that occurred within USA Gymnastics by Dr. Larry 'Lecherous' Nassar" in light of "the shocking failure of anyone to report accusations [of abuse] to law enforcement or even keep track of complaints internally[.]" 164 CONG. REC. H633, 635–36 (daily ed. Jan. 29, 2018) (statements of Rep. Poe and Rep. Jackson Lee). To address this "shocking failure," the "bill expand[ed] . . . mandatory reporting requirements to adults working at national governing boards, that is, amateur sports organizations recognized by the United States Olympic Committee." *Id.* at 635 (statement of Rep. Poe). The SSAA also "charter[ed] a new organization called Safe Sport, tasked with preventing child abuse within the national governing bodies through education and handling reports of misconduct." *Id.*

The purpose of the statute "is to clarify that a central purpose of the United States National Olympic Committee (USOC) is to promote a safe environment in sports that is free from abuse, including emotional, physical, and sexual abuse, of any amateur athlete." S. Rep. No. 115-443 at *1. The statute reflects Congress's intent to "promote a culture of reporting sexual assault among

15

youth athletes." 163 CONG. REC. H4522 (daily ed. May 24, 2017) (statement of Rep. Buck). The SSAA requires that all adult members of a national governing body "report immediately any allegation of child abuse of an amateur athlete who is a minor to . . . the Center, whenever such members or adults learn of facts leading them to suspect reasonably that an amateur athlete who is a minor suffered an incident of child abuse[.]" 36 U.S.C. § 220542(a)(2)(A). Congress intended to cast a "wide net" in applying the SSAA to as many potential reporters of sexual abuse as possible. *See* 164 CONG. REC. H633, 638 ("[W]e are the committee that has the responsibility of upholding the rule of law. And to all of those who are now in this wide net, that is the rule of law: to be able to protect our children against massive sexual abuse as they pursue their dreams.").

Congress contemplated how "[t]o minimize the risk to the Center of litigation arising from actions performed in the course of the investigation, adjudication, and sharing of information of abuse allegations[.]" S. Rep. No. 115-443 at *2. With this concern in mind, Congress "provide[d] certain limitations on liability for the Center [and] NGBs" with "exceptions to these limitations on liability in instances in which the entity has acted with actual malice or outside the scope of its duties." *Id.* Congress harbored concerns about the Center's risk of litigation because "access to adequate insurance coverage has been a challenge for the Center." *Id.* at *3. However, "[t]here is a presumption that the Center [or] NGB . . ., or officers, employees or agents thereof act pursuant to their duties . . . and without actual malice." *Id.* at *4. Congress anticipated that the limitation on liability would diminish the costs of potential litigation and "allow the Center to renegotiate its current insurance policy to receive more favorable terms." *Id.* Congress envisioned the protection on liability would "extend not only to actions for defamation, libel, slander, or damage to reputation, but also to related actions, including, but not limited to, false light, intrusion upon seclusion, tortious interference, and abuse of process." *Id.*

    b.      <u>Does the Statute Apply to USAC's Communications with *The Morning Call* and Placing the Plaintiff on the List of Suspended Riders?</u>

USAC argues that the limitation on liability immunizes it from the plaintiff's defamation and invasion of privacy claims, because "Congress recognized the 'need to promote a culture of reporting sexual assault among youth athletes.'" Def.'s Br. at 10–11 (quoting 163 Cong. Rec. H4520, 4522 (May 24, 2017) (emphasis omitted)). The plaintiff disputes that the limitation on liability applies in this case for two reasons. First, because USAC's behavior does not arise from the execution of its responsibilities or functions under the SSAA, and, therefore the behavior falls under the exception to the limitation on liability. Pl.'s Opp'n Br. at 10. Second, because USAC failed to comply with "other policies in place that the governing bodies have deemed important, such as confidentiality and the right to privacy of the accused while the investigation is ongoing." *Id.* at 11–12.

The court finds that USAC's communications with *The Morning Call* did not arise from its execution of its responsibilities under the SSAA, and, therefore, the SSAA does not immunize it from liability for its statements to the newspaper. On the other hand, USAC's decision to place the plaintiff on the list of suspended riders arose from its execution of its responsibilities, and, therefore, the SSAA protects it from liability for this action. The court disagrees with the plaintiff that this action violated the Center's policies and procedures. Even if it did, the violation would not vitiate the protection that the SSAA's limitation on liability grants to USAC.

    i.    *The Communications with The Morning Call*

The SSAA's limitation on liability does not apply to USAC's communications with *The Morning Call* because those communications did not "arise[] from the execution of the responsibilities or functions described in" the SSAA. 36 U.S.C. § 220541(d)(1). Therefore, the exception to the limitation, section 220541(d)(2), deprives USAC of the limitation's protection.

17

USAC seems to argue that the SSAA bestows complete immunity on the Center and NGBs. *See* Def.'s Br. at 13 ("To encourage such reporting and minimize the inherent risk that comes with such reporting, **Congress insulated NGBs from civil tort liability, including liability for the very claims that Nothstein asserts**." (emphasis in original)). USAC and the Center highlight cases in which "courts have consistently held that mandatory reporters are immunized from tort liability under similar statutes[.]" *Id.*; *see* Amicus Curiae Br. at 8–9 ("States have repeatedly recognized that broad qualified immunity provisions promote mandatory reporting." (citations omitted)).

The limitation on liability is broad, but it does not render USAC completely immune to civil liability. The SSAA's limitation on liability certainly extends beyond the act of reporting alleged abuse, but the protection has a demarcated boundary that USAC's interpretation of the protection fails to embrace. USAC's interpretation of the SSAA would force the court to ignore the statute's explicit exception to the limitation on liability. This exception eschews statutory protection of actions performed either with actual malice or outside the scope of an entity's duties. 36 U.S.C. § 220541(d)(2). Congress provides "a *presumption* that the Center [or] NGB . . ., or officers, employees or agents thereof act pursuant to their duties . . . and without actual malice." S. Rep. No. 115-443 at *4 (emphasis added). But a presumption is not tantamount to a certainty.

Even under the most capacious interpretation of the SSAA, the limitation on liability does not apply to USAC's statements to *The Morning Call*, because those statements did not "arise[] from the execution of the responsibilities or functions described in" the SSAA. 36 U.S.C. § 220541(d)(1). None of USAC's duties included or necessitated talking to a newspaper about the ongoing investigation. The SSAA does not cover such behavior.

In its amicus brief, the Center notes a wide array of actions to which the SSAA's limitation on liability applies. These actions include "enforc[ing] interim measures and sanctions;" "enforc[ing] the Center's measures or sanctions;" reporting an athlete's allegations of abuse to the Center; "refer[ring] individuals with questions about a sexual abuse investigation to the Center;" and "post[ing] individuals sanctioned or banned from [the] sport on a website to enforce the Center's sanctions." Amicus Curiae Br. at 6–7. This court agrees that the SSAA protection applies to these actions. However, none of these examples includes (or even come close to including) talking to the press.

In its brief, USAC cites a host of cases in which "courts have consistently held that mandatory reporters are immunized from tort liability under similar statutes, reasoning that such laws were enacted to encourage reporting." Def.'s Br. at 12. However, the cases USAC cites are distinct from the facts in this case. The only Pennsylvania case it cites, *Miller v. The Watson Institute*, No. GD13-9177, 2013 Pa. Dist. & Cnty. Dec. LEXIS 244 (Allegheny Cnty. Ct. Com. Pl. Nov. 1, 2013), is not instructive (even if it was somehow binding) because the defendant's conduct in that case clearly fell under the protection of immunity. In *Miller*, the plaintiffs alleged defamation after one of the defendants, a social services worker, reported suspected child abuse to the Allegheny County Department of Children, Youth, and Families. 2013 Pa. Dist. & Cnty. Dec. LEXIS 244, at *1. Under Pennsylvania law, social services workers—as mandatory reporters— enjoy "immunity from civil and criminal lability that might otherwise result" from reporting, so long as they report "in good faith." 23 Pa. C.S. § 6318(a)-(b). The plaintiffs claimed the defendant made the report in bad faith. *Miller*, 2013 Pa. Dist. & Cnty. Dec. LEXIS 244, at *2. After the defendant moved to dismiss the complaint, the trial court granted the motion and dismissed the

complaint after determining that it did not adequately allege that the defendant acted in bad faith. *Id.*

Another case cited in the plaintiff's brief presents a nearly identical situation. In *Dunkle v. Children's Hospital Medical Center of Akron*, the court examined a statute providing that "anyone participating in good faith in a judicial proceeding resulting from the reports [of abuse], shall be immune from civil or criminal liability[.]" No. 26612, 2013-Ohio-5555, 5 N.E.3d 131, 136 (Ohio Ct. App. 2013). Because the court concluded the mandatory reporter acted in good faith, he was entitled to immunity. *Id.* at ¶ 23.

Neither of these cases is instructive here because the mandatory reporters acted in good faith, and, therefore complied with the requirements necessary for the courts to grant them immunity. These cases would only be instructive if the defendants acted in bad faith and their actions fell into the exception to immunity, but the courts nonetheless concluded that they were immune. Here, the record shows that USAC did not comply with the requirements necessary for the court to grant it immunity. Instead, it operated outside of the bounds of its duties, so its behavior falls into the exception to the SSAA's limitation on liability.

           ii.     *Placing the Plaintiff on the List of Suspended Riders*

In contrast to the communications with *The Morning Call*, USAC's decision to suspend the plaintiff's riding license and (inadvertently) place him on a list of suspended riders "ar[o]se[] from the execution of the responsibilities or functions described in" the SSAA, and is, therefore, protected by the SSAA's limitation on liability. 36 U.S.C. § 220541(d)(1). The SSAA specifically empowers the NGBs to "impose an interim measure to prevent an individual who is the subject of an allegation of sexual abuse from interacting with an amateur athlete prior to the Center exercising

its jurisdiction over a matter." *Id.* § 220542(b). Suspending the plaintiff's license and keeping him from interacting with other athletes constitutes such an "interim measure."

The plaintiff argues that USAC's action was outside the bounds of the SSAA for two reasons. First, because it took this action after it had referred this matter to the Center, and, therefore, this action did not constitute an "interim measure." Pl.'s Opp'n Br. at 13. Second, because this action violated the Center's confidentiality policy. *Id.* at 11–12. The court rejects both of these arguments.

The plaintiff contends that when USAC placed his name on the list of suspended riders, its "inquiry was complete [and the Center's] investigation was ongoing," so the window within which USAC could have imposed an interim measure had closed. *Id.* at 13. However, the window had not closed, because the Center had not "exercis[ed] its jurisdiction over [the] matter" by rendering a decision. 36 U.S.C. § 220542(d). Therefore, USAC was still within its statutory power to enforce an interim measure.

The plaintiff also asserts that USAC's action does not fall under the protection of the SSAA's limitation on liability because placing him on the list violated the Center's own policy. *See* Pl.'s Opp'n Br. at 13 (contending that action "violated [the Center's] own provisions regarding privacy and confidentiality, yet, interestingly, [the Center's] Brief is silent on that issue"). It seems the plaintiff is specifically referring to the privacy provisions of the SafeSport Code. However, the SafeSport Code[4] only refers to privacy as it relates to reporters of sexual abuse, not alleged perpetrators.

---

[4] The court has two different, albeit similar, versions of the Code. The plaintiff provided one version as an exhibit appended to his brief in opposition to the motion for summary judgment. Pl.'s Opp'n Br., Ex. H. The Center referenced a different version of the Code in a footnote in its amicus. *See* Amicus Curiae Br. at 4 n.3 (referring the court to *SafeSport Code for the Olympic and Paralympic Communities*, 44-45, available at https://uscenterforsafesport. org/wp-content/uploads/2020/03/2020-SafeSport-Code-04.01.20.pdf). The version appended to the plaintiff's brief was effective as of March 3, 2017. The version referenced in the amicus became effective on April 1, 2020—after the events at issue in this matter occurred. Therefore, the court relies on the version appended to the plaintiff's brief.

Three portions of the Code specifically concern privacy. The first provides that "[i]f a Reporting Party would like the details of an incident to be kept confidential, the Reporting Party may speak with the USOC's Athlete Ombudsman's Office." SafeSport Code at 3. The second provides that if "a Reporting Party does not wish for their name or identity to be shared, does not wish for an investigation to take place or does not want a formal resolution to be pursued, the Reporting Party may make such a request to the Office, which will evaluate the request." *Id.* at 4. The third provides that

> [i]nformation will be shared only as necessary with investigators, witnesses and the Responding Party. It will be necessary for the Office to (a) notify the NGB of an allegation involving a Covered Individual from that NGB, (b) if the Office seeks an interim measure, (c) if the Office proceeds to a full investigation, and (d) any final decision regarding whether a violation occurred and sanctions, if any. But the Office will not disclose the identity of a Reporting Party to the NGB unless necessary to the case.

*Id.* None of these provisions indicates there will be any level of confidentiality afforded to the alleged perpetrator. Even the reporters cannot ensure their own confidentiality because "[i]n cases indicating pattern . . . the Office will likely be unable to honor a [reporter's] request for confidentiality." *Id.*

Given that the SafeSport Code does not provide confidentiality protections to the plaintiff, USAC did not violate the Code and his argument on this point is unpersuasive. Further, even if USAC violated the Code, the plaintiff fails to explain how such a violation is germane to the question of whether USAC's actions constituted defamation and invasion of privacy.

### 2.    Is There a Genuine Issue of Material Fact as to the Defamation Claim?

Under Pennsylvania state law,[5] a plaintiff establishes a defamation claim by proving (1) the defamatory character of the communication; (2) publication of the communication by the

---

[5] This court has jurisdiction over this case based on diversity. "As we are sitting in diversity, Pennsylvania law governs." *McCafferty v. Newsweek Media Grp.*, 955 F.3d 352, 356 (3d Cir. 2020).

defendant; (3) application to the plaintiff; (4) the recipient's understanding of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) the defendant lacked a conditional privilege to make the statement. 42 Pa. C.S. § 8343(a) (West 1998); *see also Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir. 2014) (listing relevant elements); *Mallory v. S&S Publishers*, 260 F. Supp. 3d 453, 459 (E.D. Pa. 2017) (same). Additionally, a public figure plaintiff must prove that the statement was false and that the statement was made with actual malice.[6] *See Mallory*, 260 F.Supp.3d at 462 (describing standard); . "Actual malice means knowledge that the statement was false or reckless disregard of whether it was false or not." *Id.* (alterations omitted).

The plaintiff also claims that USAC's actions constitute defamation *per se*. *See* Compl. at ¶ 45. A defamatory statement which "imputes a criminal offense, loathsome disease, business misconduct, or serious sexual misconduct . . . constitutes defamation *per se* and proof of 'special' damages is not required." *Rose v. Dowd*, 265 F. Supp. 3d 525, 531 (E.D. Pa. 2017) (citations omitted). The difference between defamation and defamation *per se* is that "only general damages, *i.e.*, proof that one's reputation was actually affected by the defamation or that one suffered

---

[6] The Supreme Court differentiated between public and private figures (and, consequently, determined that the actual malice standard applied to public, but not private figures) on two grounds:

> First, public officials and public figures have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. [*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).] Because private individuals have less access to effective self help, such individuals are more vulnerable to injury and the state has a correspondingly greater interest in protecting them.

> More importantly, the Court in *Gertz* stated that individuals who seek public office or who are public figures have assumed the risk that in the course of reporting and commenting on a well known person or public controversy, the press may inadvertently make erroneous statements about them. Thus those individuals are less deserving of protection. *See id.* at 344–45, 94 S.Ct. at 3009-10; *see also Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2705, 61 L.Ed.2d 450 (1979).

*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1081 (3d Cir. 1985).

personal humiliation, or both, must be proven; special damages, *i.e.*, out-of-pocket expenses borne by the plaintiff due to the defamation need not be proven." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 344 (Pa. Super. 2008).

When addressing a defamation claim, the court "need resolve only the first element: whether the . . . statements could be defamatory." *McCafferty*, 955 F.3d at 357; *see Mallory*, 260 F. Supp. 3d at 458 ("In a defamation action, the Court must make a threshold determination of whether a challenged statement is capable of defamatory meaning." (citations omitted)). "A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Graboff*, 744 F.3d at 136 (citation and internal quotation marks omitted). The statement "must provoke the kind of harm which has grievously fractured one's standing in the community of respectable society." *Id.* (citation, internal quotation marks, and alteration omitted). Importantly, "[a] defendant may avoid liability for defamation if it shows that its statements were 'substantially true.'" *Id.* (quoting 42 Pa. C.S. § 8343(b)(1)); *see also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 490 (1975) (explaining that in cases involving defamed public official or public figure, plaintiff must prove "not only that the publication is false but that it was knowingly so or was circulated with reckless disregard for its truth or falsity").

The plaintiff claims that USAC's statements to *The Morning Call* defamed him. Those statements were as follows: (1) USAC received a complaint concerning the plaintiff; (2) USAC forwarded the complaint to the Center; (3) before referring the complaint, USAC "gathered enough specificity to allege a policy has been violated;" (4) the "allegation . . . included sexual misconduct;"[7] and (5) "When USA[C] receives an allegation of sexual misconduct, [it is] not

---

[7] The parties disagree about whether Mr. Whiteman actually said the investigation involved sexual misconduct. Def.'s Br. at 8; Pl.'s Opp'n Br. at 22. In his deposition, Mr. Whiteman indicates he did not tell the reporter that the allegation

making any determination of validity before reporting it to the [Center]." Compl. at ¶ 38; Pl.'s Opp'n Br. at 16; *see* Pl.'s Opp'n Br., Ex. J, Doc. No. 61-13.

USAC contends that the statements are not capable of defamatory meaning and the court must grant summary judgment in regard to its statements to *The Morning Call* for two reasons. First, it asserts that its statements are more than just substantially true; they are completely true. Def.'s Br. at 16. Second, it claims that the plaintiff cannot show actual malice by clear and convincing evidence. *Id.* at 18–22.

In response to USAC's first argument, the plaintiff claims that USAC "ignores the law in Pennsylvania which provides that defamation may be established by implication and insinuation." Pl.'s Opp'n Br. at 16–17 (citing *Graboff*, 744 F.3d at 136). In response to USAC's second argument, the plaintiff argues that USAC's "decision to selectively reveal certain facts, while purposely avoiding others" in conjunction with its "violation of its own confidentiality and privacy rules" constitutes evidence of actual malice sufficient to overcome the motion for summary judgment. *Id.* at 21.

"Whether the contested statements are capable of defamatory meaning is a question of law for the court" to decide. *Blackwell v. Eskin*, 916 A.2d 1123, 1125 (Pa. Super. 2007). "In reaching this conclusion, the court must view the statements in context[.]" *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987) (citation omitted). "The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it is directed." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010) (citation

---

"was sexual in nature." Whiteman Dep. at 114:4–19. However, Mr. Whiteman drafted an email to the reporter to "make . . . clear" that "[w]hen receiving allegations of sexual misconduct, USA Cycling makes no determination of the validity of the allegation before reporting it to the U.S. Center for SafeSport." Pl.'s Opp'n Br., Ex. I. Viewing the evidence in the light most favorable to the non-moving party (the plaintiff), the court presumes Mr. Whiteman revealed that this investigation concerned allegations of sexual misconduct.

omitted). The court concludes that USAC's statements to *The Morning Call* were incapable of defamatory meaning because they were true. Even if the statements were not true, they are incapable of defamatory meaning because there is no evidence that USAC's representative made the statements with actual malice.

a.     The Statements to *The Morning Call* Were True

The court finds that the first, second, fourth, and fifth statements are objectively true, and, therefore are not defamatory. USAC received a complaint about sexual misconduct regarding the plaintiff. Def.'s Facts at ¶ 12; Pl.'s Resp. at ¶ 12; *see* Def.'s Br., Ex. I (reporting that Mr. Whiteman "spoke with a third-party reporter who" told him "a freelance journalist ha[d] been in contact with him and many others" concerning "sexual harassment, sexual misconduct, and sexual relationships with underage female athletes towards Marty Nothstein"). USAC forwarded the complaint to the Center on November 1, 2017. Def.'s Facts at ¶ 32; Pl.'s Resp. at ¶ 32. As a mandatory reporter, USAC does not evaluate the credibility of an allegation before turning it over to the Center. Pl.'s Opp'n Br., Ex. H at 2 (indicating that mandatory reporters "should not investigate, or attempt to evaluate the credibility or validity of allegations involving sexual misconduct, as a condition of reporting to the Office." (emphasis omitted)).

Determining whether the third statement – that before referring the complaint, USAC "gathered enough specificity to allege a policy has been violated" – is true requires additional scrutiny. The court concludes that Mr. Whiteman's third statement is incapable of defamatory meaning for two reasons. First, because of how the reasonable person would construe the third statement in context with the fifth statement. Second, because the third statement is an opinion that is not provable as false.

First, the court examines the context of the statement. "In Pennsylvania, an opinion cannot be defamatory unless it may reasonably be understood to imply the existence of *undisclosed defamatory facts* justifying the opinion[,]" by failing to "disclose[] the factual basis behind" the opinion. *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (citation and internal quotation marks omitted). Mr. Whiteman did not disclose the factual basis of his opinion that he had gathered enough specificity to allege a policy had been violated. Out of context, there might be a viable argument that the reasonable person could presume that Mr. Whiteman reviewed specific, undisclosed allegations of sexual assault and that these undisclosed allegations were credible. However, the fifth statement buttresses against any such presumption. Mr. Whiteman clarified that USAC had not made "any determination of validity before reporting it to the [Center]." Therefore, the reasonable person would not read the third statement in context and conclude USAC had to disclose these allegations to the Center because there were undisclosed defamatory facts which rendered the allegations credible.

Second, the court construes Mr. Whiteman's third statement as an opinion that is not provable as false. The court must carefully analyze an opinion for its defamatory meaning because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1972). However, there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (citation omitted). Such a wholesale exception would "ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact." *Id.*

There are two types of opinions: pure and mixed. "The pure type[] occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a" conclusion. Restatement (Second) Torts, § 566 (1977). "[T]he mixed type[] is one which, while

an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant[.]" *Id.* Mr. Whiteman's third statement is a mixed opinion in that he rendered the conclusion that he "gathered enough specificity to allege a policy has been violated," but did not indicate the specific evidence he amassed to support that conclusion.

To determine whether Mr. Whiteman's statement constitutes an opinion capable of defamatory meaning, the court asks whether the statement is "provable as false." *Milkovich*, 497 U.S. at 19. "[A] statement on matters of public concern *must* be provable as false before there can be liability under state defamation law[.]" *Id.* (emphasis added). A statement's falsity "may be provable as false on two levels." *Id.* at 20, n.7. "For instance, the statement 'I think Jones lied' may be provable as false [if] . . . "the speaker really did not think Jones had lied, but said it anyway" and if "Jones really had not lied." *Id.*

In the instant case, the plaintiff has not pointed to any evidence in the record that demonstrates Mr. Whiteman did not believe that his investigation had produced enough specificity to allege a policy had been violated. Therefore, the court focuses on whether the statement that the investigation produced enough specificity to allege a policy had been violated is provable as false. The court concludes that the statement is not provable as false because finding "enough specificity to allege a policy had been violated" is a subjective metric that cannot be objectively evaluated for its truth.

b.   <u>USAC Did Not Act with Actual Malice</u>

The First Amendment mandates that a defendant act with actual malice for its statements to constitute defamation about a public figure. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 272 (3d Cir. 1980) (describing standard and its origins); *McCafferty*, 955 F.3d at 359 ("To show

defamation, a public figure (even if just a 'limited purpose public figure' . . .) must show that the publisher acted with 'actual malice.'" (quoting *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007))). "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commc'ns, Inc. v. Connaughton ("Harte-Hanks")*, 491 U.S. 657, 685 (1989) (citation omitted). The plaintiff must provide clear and convincing evidence that the defendant acted with actual malice. *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 438 (E.D. Pa. 2003) ("[P]ublic figure is required to prove, by clear and convincing evidence, that the defendant published false material by actual malice."). "Actual malice is a term of art that does not connote ill will or improper motivation. Rather, it requires that that the publisher either know that its [statement] was false or publish it with reckless disregard for its truth." *McCafferty*, 955 F.3d at 359 (citation and internal quotation marks omitted).

Before addressing the actual malice inquiry, the court must address the threshold question of whether the plaintiff is a public official or public figure.[8] "[I]t is for the trial judge in the first instance to determine whether the proofs show respondent to be a public official" or public figure. *Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966) (internal quotation marks omitted). The court concludes the plaintiff is both a public official and an all-purpose public figure, because he was already a member of the Lehigh County Board of Commissioners and was seeking a seat in the United States House of Representatives at the time of the events at issue in this case.[9] *See Gertz*, 418 U.S. at 345

---

[8] It is unclear whether the plaintiff concedes that he is a public figure. *See* Pl.'s Opp'n Br. at 19 ("[a]ssuming *arguendo* that Plaintiff is a public figure"). Therefore, the court must address this issue. *See Medure v. Vindicator Printing Co.*, 273 F. Supp. 2d 588, 608 (W.D. Pa. 2002) ("Determining whether a plaintiff in a defamation case is a public or private figure is a question of law for the court to decide.").

[9] At a minimum, he was a limited purpose public figure.

(explaining all-purpose public figures are private individuals who are in "positions of such persuasive power and influence that they are deemed public figures for all purposes").

The court now turns to the actual malice inquiry. The plaintiff contends that USAC is liable for defamation for "implying the existence of false and defamatory facts by making partial, misleading disclosures to the media about the reported incident, without also disclosing the dubious credibility of the report and the fact that the alleged victim had sworn in an affidavit that the allegations were not true." Pl.'s Opp'n Br. at 14 (citation omitted). Such omissions do not amount to actual malice. "The actual malice standard is not satisfied by proof of even 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 498 (E.D. Pa. 2018) (quoting *Harte-Hanks*, 491 U.S. at 666). Rather, "'actual malice' requires that 'the defendant in fact entertained serious doubts as to the truth of his publication.'" *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). The plaintiff does not point to a portion of the record that demonstrates USAC entertained any serious doubts about the veracity of the statements it made to *The Morning Call*. Even if USAC did not do enough to substantiate these allegations prior to talking to *The Morning Call*, it is not liable for defamation because "mere proof of failure to investigate, without more, cannot establish" such serious doubts as to the truth of the publication. *Gertz*, 418 U.S. at 332.

The plaintiff claims that *Harte-Hanks Communications, Inc. v. Connaughton* is instructive in this case because of the "purposeful avoidance doctrine." Pl.'s Opp'n Br. at 20. *Harte-Hanks* involved a local newspaper's coverage of a race for Municipal Judge. 491 U.S. at 660. The newspaper endorsed the reelection of the incumbent over the challenger, Connaughton. *See id.* ("Petitioner is the publisher of the Journal News, a local newspaper that supported the reelection

of the incumbent, James Dolan."). The incumbent's Director of Court Services resigned and was arrested on bribery charges prior to the election. *Id.* The most important witness to the bribery charges against the Director of Court Services was Patsy Stephens. *Id.* at 668. In a tape-recorded interview with Connaughton, Stephens explained how she had visited the Court Administrator and made cash payments to dispose of criminal charges on behalf of various relatives. *Id.*

The newspaper published an in-depth story concerning the investigation. *Id.* at 660. The story focused on Stephens's sister—a grand jury witness—who claimed that Connaughton used "dirty tricks" and offered her and Stephens tangible benefits in exchange for assistance with the investigation. *Id.* Connaughton filed a lawsuit claiming defamation. *Id.* A jury found in favor of Connaughton and the case eventually made its way to the Supreme Court. *Id.* at 661–63.

The Court unanimously concluded that the defendant acted with actual malice, because the defendant purposefully avoided the truth by failing to investigate "obvious reasons to doubt the veracity of the informant or the accuracy of [the] reports[.]" *Id.* at 688 (citation and internal quotation marks omitted). The Court found that there was adequate evidence to demonstrate the newspaper "had serious doubts concerning the truth of [Stephens's sister's] remarks, but was committed to running the story[.]" *Id.* at 682. These serious doubts stemmed from the paper's interview with Connaughton and five other witnesses, which stood in direct contrast to specific parts of the paper's interview with Stephens's sister. *Id.* at 691. Rather than unpack these contradictions by speaking to Stephens directly, the paper opted to purposefully avoid the truth and publish a story in spite of serious doubts. *See id.* at 682 ("It is utterly bewildering . . . that the Journal News committed substantial resources to investigating [Stephens's sister's] claims, yet chose not to interview the one witness who was most likely to confirm [her] account of the events."). The Court drew a distinction between this "purposeful avoidance of the truth" and the

"failure to investigate." *Id.* at 692. The court maintained that the failure to investigate still does not "support a finding of actual malice." *Id.* (citation omitted).

This case is distinct from *Harte-Hanks* because USAC's representative, Mr. Whiteman, did not have reasons to seriously doubt his statements to *The Morning Call*. In *Harte-Hanks*, the Court contemplated whether the paper's willful ignorance of the truth, despite the paper's many reasons to doubt the validity of the story, constituted actual malice. Here, the plaintiff claims that USAC's failure to speak with him and the alleged victims is akin to the newspaper's purposeful avoidance of the truth in *Harte-Hanks*. However, in *Harte-Hanks*, the newspaper knew its main source might be faulty and published her statements anyway, choosing not to drill down on the evidence that might contradict her. In this case, USAC's representative, Mr. Whiteman, did not have reason to doubt any of his statements to *The Morning Call*, because each of these statements was true. As such, the plaintiff has failed to show a genuine issue of material fact as to whether USAC acted with actual malice.

**3.      Is There a Genuine Issue of Material Fact as to the Invasion of Privacy—False Light Claim?**

"Pennsylvania recognizes the tort of false light invasion of privacy, and has adopted the Restatement (Second) of Torts definition of it." *Miller v. Shubin*, Case No. 4:15-cv-1754, 2016 WL 2752675, at *8 (M.D. Pa. May 11, 2016); *see also Harris by Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1383 (Pa. Super. 1984) ("Our state courts have cited with approval the Restatement (Second) of Torts §§ 652B–E for support regarding invasion of privacy matters. We believe that the Restatement most ably defines the elements of invasion of privacy as that tort has developed in Pennsylvania." (internal citation omitted)). Under section 652E of the Restatement:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E.

The difference between invasion of privacy—false light and defamation is "false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." *Miller*, 2016 WL 2752675, at *8 (citation and internal quotation marks omitted). To prove invasion of privacy false light "[i]t is enough that [the plaintiff] is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Restatement (Second) Torts § 652E cmt. b (describing false light invasion of privacy's relation to defamation).  Essentially, "[t]he tort of false light is . . . committed when someone tells part of the story, and selects the worst parts of the story to make the other look bad." *Miller*, 2016 WL 2752675, at *8.

The court finds that the plaintiff has not demonstrated there is a genuine issue of material fact as to whether USAC placed him in a false light for two reasons. First, USAC's "truthful information about an ongoing investigation would [not] have been highly offensive to a reasonable person." *Id.* at *9. The information USAC provided to *The Morning Call* "was truthful, concise, and not selective." *Id.* The information did not indicate that the plaintiff actually perpetrated sexual assault, rather that there were allegations of assault and those allegations had "enough specificity to allege a policy has been violated." Second, and, "[p]erhaps most importantly, the information disseminated was of legitimate concern to the public." *Id.* "The value and efficacy of" the public's right to elect members of the government "depends on the knowledge of the comparative merits

33

and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." *Harte-Hanks*, 491 U.S. at 687 (citation and internal quotation marks omitted). Therefore, as an individual running for public office, the "[p]laintiff's stature in the community as a public figure resulted in a relinquishment of insulation from scrutiny of [his] public affairs," *Miller*, 2016 WL 2752675, at *9 (citation and internal quotation marks omitted), and he "cannot cry Foul! when" an entity or individual "attempts to demonstrate that he . . . lacks . . . sterling integrity." *Harte-Hanks*, 491 U.S. at 687 (citation and internal quotation marks omitted). Accordingly, there is no genuine issue of material fact that would preclude summary judgment on the false light invasion of privacy claim.

### 4.  Is There a Genuine Issue of Material Fact as to the Intrusion Upon Seclusion Claim?

To establish intrusion upon seclusion under Pennsylvania law, a plaintiff must demonstrate (1) "an intentional intrusion" (2) "upon the seclusion [the plaintiff's] private concerns" (3) " which was substantial and highly offensive to a reasonable person," and (4) "aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities." *Boring v. Google Inc.*, 362 F. App'x 273, 278–79 (3d Cir. 2010) (quoting *Pro Golf Mfg., Inc. v. Tribune Rev. Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002)); *see* Restatement (Second) of Torts § 652B (defining intrusion upon seclusion tort with these same criteria). Unlike a claim of defamation or invasion of privacy—false light, intrusion upon seclusion "does not have an element of publication." *Brown v. United States*, Civ. A. No. 17-1551, 2018 WL 741731, at *11 (E.D. Pa. Feb. 7, 2018) (citation omitted); *see* Restatement (Second) of Torts § 652B cmt. a ("The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs."). The court concludes

that the plaintiff has not established that there is a genuine issue of material fact as to the first two elements of intrusion upon seclusion, and, therefore, also grants summary judgment on this claim.

First, the plaintiff has failed to demonstrate that there is a genuine issue of material fact as to the intentional intrusion. Intentional intrusion occurs when an actor "believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 293 (3d Cir. 2016) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989)). The plaintiff argues that USAC "invaded [hi]s privacy knowing that [USAC] was subject to the confidentiality provisions in [the Center's] Practices and Procedures, and that therefore it lacked the necessary legal or personal permission to commit such tortious acts." Pl.'s Opp'n Br. at 29. However, as discussed previously, the Center's Code provisions concerning privacy apply to alleged victims and reporters, not to the alleged perpetrators. *See id.*, Ex. H at 3–4. Further, it is undisputed that USAC consulted in-house counsel prior to speaking with *The Morning Call*. Def.'s Facts at ¶ 54; Pl.'s Resp. at ¶ 54. Therefore, the plaintiff provides the court with no evidence that USAC believed it lacked necessary legal or personal permission to speak to *The Morning Call*.

Second, the plaintiff fails to demonstrate that there is a genuine issue of fact as to an intrusion upon his private concerns. Intrusion upon the seclusion of another occurs "when [the defendant] has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 293 (alteration in original) (citations and internal quotation marks omitted). The Restatement provides varying examples of intrusions. These examples fall into three buckets: the physical intrusion, the sensory intrusion, and the other investigatory intrusion. A physical intrusion is an intrusion "into a place in which the plaintiff has secluded himself, as when the defendant forces

his way into the plaintiff's room in a hotel[.]" Restatement (Second) of Torts § 652B cmt. b. A sensory intrusion is an intrusion "by the use of the defendant's senses . . . to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires." *Id.* An "other investigatory intrusion" is "some other form of investigation . . . into [the plaintiff's] private concerns." *Id.* Examples of "some other form[s] of investigation" include "opening [the plaintiff']s private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." *Id.*

The plaintiff argues that he had "an expectation of privacy . . . with respect to the [Center's] investigation and the underlying accusations[,]" and, "[a]ccordingly, there is a genuine issue of material fact as to whether [USAC] invaded [hi]s personal space, affairs or concerns." Pl.'s Opp'n Br. at 28–29. The plaintiff's purported intrusion does not neatly fall into any of the three buckets of examples provided in the Restatement. The closest fit is the other investigatory intrusion. However, USAC performed no investigation in disclosing these statements to *The Morning Call*. USAC did not perform any act remotely analogous to "opening [the plaintiff's] personal mail, searching his safe or his wallet, examining his private bank account or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts § 652B cmt. b.

The plaintiff argues this case is similar to *Brown v. United States* and *Doe v. Kohn Nast & Graf P.C.*, 866 F. Supp. 190 (E.D. Pa. 1994). In *Brown*, the plaintiff brought an action against a medical center after an employee of the center disclosed the plaintiff's health information to a third party in violation of HIPAA regulations and the center's privacy policy. *Brown*, 2018 WL 741731, at *11. In *Doe*, an attorney with HIV brought an action against a law firm after the law firm

allegedly opened the plaintiff attorney's personal mail. 866 F. Supp. at 195. This case is distinct from *Brown* and *Doe* because USAC did not perform an intrusive investigation in the same manner as the defendants in *Brown* and *Doe*. Reporters approached USAC; USAC disclosed this information to the Center; and USAC succinctly confirmed to *The Morning Call* that it had received such information and passed it onto the Center. Therefore, the plaintiff cannot demonstrate a genuine issue of material fact that would preclude this court from entering summary judgment on his intrusion upon seclusion invasion of privacy claim.

## IV.    CONCLUSION

For the reasons set forth above, the court grants USAC's motion for summary judgment. Although the court concludes that the SSAA immunizes USAC from liability with respect to Mr. Whiteman's statements to *The Morning Call*, it does immunize it for the act of placing the plaintiff on the list of suspended riders. The court also concludes that there is no genuine issue of material fact such that the plaintiff can demonstrate USAC's statements to *The Morning Call* render it liable for the torts of defamation, invasion of privacy—false light, or invasion of privacy—intrusion upon seclusion.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.